FLORIDA AUDUBON SOCIETY,
et al., Appellants,

v.

Lloyd M. BENTSEN, Secretary of the
Treasury, and Margaret Richardson,
Commissioner of the Internal Revenue
Service, Appellees.

No. 94–5178.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 31, 1996.

Decided Aug. 20, 1996.

David F. Williams, Washington, DC, argued the cause for appellants, with whom James W. Moorman and Jonathan R. Stone were on the briefs.

David C. Shilton, United States Department of Justice, argued the cause for appellees, with whom Lois J. Schiffer and Loretta C. Argrett, Assistant Attorneys General, and Albert M. Ferlo, Jr., Gary R. Allen, and Teresa E. McLaughlin, Washington, DC, were on the brief.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE, with whom SILBERMAN, WILLIAMS, GINSBURG, HENDERSON, and RANDOLPH, Circuit Judges, join.

Concurring opinion filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge ROGERS, with whom EDWARDS, Chief Judge, WALD, and TATEL, Circuit Judges, join.

SENTELLE, Circuit Judge:

The Constitution limits the jurisdiction of the federal judiciary to actual cases or controversies between proper litigants. *See Liverpool, New York, & Philadelphia Steam–Ship Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885). In order to qualify as a proper litigant, the party bringing the action must, in the least, demonstrate that it has constitutional standing to invoke the authority of an Article III court. *See, e.g., Flast v. Cohen,* 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952–53, 20 L.Ed.2d 947 (1968). To have constitutional standing, a party must establish that it has "personally . . . suffered some actual or threatened injury," which may be "fairly . . . traced to the challenged action" and is "likely to be redressed by a favorable decision" of the court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982) (internal quotations and citations omitted). A party that fails to demonstrate

any of these prerequisites cannot seek relief from the federal judiciary.

The fundamental importance of standing has prompted our review in banc of the district court's judgment that Diane Jensen, the Florida Audubon Society, the Florida Wildlife Federation, and the Friends of the Earth ("appellants") cannot sue the Secretary of the Treasury and the Commissioner of the Internal Revenue Service ("Secretary") for authorizing a tax credit for the use of a particular alternative fuel additive known as ethyl tertiary butyl ether ("ETBE") without preparing an Environmental Impact Statement ("EIS"). Because the district court properly determined that appellants had demonstrated neither a personal injury nor an injury fairly traceable to the challenged acts of the Secretary, we affirm its decision that appellants lacked standing.

## BACKGROUND

The National Environmental Policy Act ("NEPA") generally requires "agencies of the Federal Government" to "include in every ... report on ... major Federal actions significantly affecting the quality of the human environment" an EIS detailing that effect. See 42 U.S.C. § 4332(2)(C). Regulations implementing this provision allow agencies to categorically exclude a class of actions from the EIS requirement if that class of actions does not "have a significant effect on the human environment." 40 C.F.R. § 1508.4. In Treasury Directive ("TD") 75–02, the Secretary of the Treasury concluded that clarifications of tax rules qualify for such a categorical exclusion. See Final Procedures for Implementation of the NEPA Regulations, 45 Fed.Reg. 1828, 1830 (Jan. 8, 1980).

In March 1990, after urging from various members of Congress and comment from other interested parties, the Secretary of the Treasury, through a clarification of an existing rule, expanded a tax credit for the use of certain gasoline-ethanol blends to the use of blends of gasoline and ETBE, which is a fuel additive derived from, but not containing, ethanol. See Alcohol Fuels Credit; Definition of Mixture, 55 Fed.Reg. 8946 (1990) (codified at 26 C.F.R. Part 1). Believing that the ETBE credit fell within the categorical exclusion of TD 75–02, the Secretary did not prepare an EIS before approving the final rule. See Alcohol Fuels Credit, 58 Fed.Reg. at 8947. In the three years after the rule was promulgated, no ETBE production occurred in the United States. 1994, however, finally witnessed the start-up of three plants which, together, may produce up to 3,980 barrels of ETBE per day, or less than one-twentieth of the 102,904 barrels of ethanol that existing facilities can produce daily.

Appellants did not take as long to respond to the new tax credit. In proceedings begun two months after the new regulation was finalized, they sued to permanently enjoin enforcement of the rule and to require the Secretary to prepare an EIS. Upon reviewing cross-motions for summary judgment, the district court concluded that appellants lacked standing.

More precisely, the district court dismissed as "speculative" appellants' argument that the tax credit, by increasing the market for ETBE, would stimulate production of the corn, sugar cane and sugar beets necessary to make the ethanol from which ETBE is derived, and that this increased crop production would, in turn, necessarily result in more agricultural cultivation, with its accompanying environmental dangers, in regions that border wildlife areas appellants (or their members) use and enjoy. The court declared that, even if it presumed that the tax credit would increase corn and sugar production, appellants had advanced no credible evidence that the increased production would necessarily harm or even occur near the wildlife areas in Michigan, Minnesota, and Florida that appellants visit. Because appellants had not established a geographic nexus between the harm they asserted that the tax credit will likely cause and lands that appellants—or their members—use, the court ruled that appellants had not suffered the particularized injury necessary for standing. The court also found that appellants lacked standing because they had not demonstrated that the tax credit was substantially likely to cause any harm to wildlife areas. The dis-

trict court thus granted the Secretary's motion for summary judgment.

On the initial appeal, a divided panel reversed. The majority held Jensen's claims that increased corn production might affect specific wildlife areas in Minnesota sufficient to satisfy the geographic nexus requirement. *See Florida Audubon Soc. v. Bentsen,* 54 F.3d 873, 880–83 (D.C.Cir.1995). It also concluded that appellants demonstrated all the causation necessary for standing because an EIS might prompt the Secretary to "rescind or otherwise modify the ETBE tax credit." *Id.* at 882. We subsequently agreed to review the issue of standing in banc. *Florida Audubon Soc. v. Bentsen,* 64 F.3d 712 (D.C.Cir.1995).

## DISCUSSION

■ Because Article III limits the constitutional role of the federal judiciary to resolving cases and controversies, *see, e.g., Chicago & Grand Trunk Railway Co. v. Wellman,* 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892), a showing of standing "is an essential and unchanging" predicate to any exercise of our jurisdiction. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). In order to satisfy the "irreducible constitutional minimum of standing," a litigant must demonstrate that it has suffered a "concrete and particularized" injury that is: 1) "actual or imminent," *id.*; 2) caused by, or fairly traceable to, an act that the litigant challenges in the instant litigation, *see Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984); and 3) redressable by the court. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). This set of criteria implements Article III by limiting judicial intervention to only those disputes between adverse parties that are "'in a form ... capable of judicial resolution.'" *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 218, 94 S.Ct. 2925, 2930–31, 41 L.Ed.2d 706 (1974) (quoting *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968)).

The two essential components of the injury element of standing roughly illustrate the aims of the entire standing inquiry. A prospective plaintiff must show that it has suffered a concrete and particularized injury in order to convince the court that it is sufficiently involved in the current legal dispute to have a defined and personal stake in the outcome of the litigation—in other words, that it is a "proper" plaintiff. *See Defenders of Wildlife,* 504 U.S. at 581, 112 S.Ct. at 2147 (Kennedy, J., concurring). A plaintiff must also show that the particularized injury is at least imminent in order to reduce the possibility that a court might unconstitutionally render an advisory opinion by "deciding a case in which no injury would have occurred at all," *Defenders of Wildlife,* 504 U.S. at 564 n. 2, 112 S.Ct. at 2138 n. 2 (citing *Whitmore v. Arkansas,* 495 U.S. 149, 156–60, 110 S.Ct. 1717, 1723–26, 109 L.Ed.2d 135 (1990); *Los Angeles v. Lyons,* 461 U.S. 95, 102–06, 103 S.Ct. 1660, 1665–67, 75 L.Ed.2d 675 (1983))—in other words, to help confirm that the judiciary is the proper branch of government to hear the dispute. *See Laird v. Tatum,* 408 U.S. 1, 13, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972) (quoting *Ex Parte Lévitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937)).

■ Causation and redressability, *see, e.g., Allen,* 468 U.S. at 753 n. 19, 104 S.Ct. at 3325–26 n. 19; *Von Aulock v. Smith,* 720 F.2d 176, 180–81 (D.C.Cir.1983), similarly assure that proper parties have brought their dispute to the proper branch of the federal government. Causation, or "traceability," *see Haitian Refugee Center v. Gracey,* 809 F.2d 794, 801 (D.C.Cir.1987) (Opinion of Bork, J.), examines whether it is substantially probable—*see, e.g., Kurtz v. Baker,* 829 F.2d 1133, 1144 (D.C.Cir.1987) (citing *Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975)), *cert. denied,* 486 U.S. 1059, 108 S.Ct. 2831, 100 L.Ed.2d 931 (1988)—that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff. *See Allen,* 468 U.S. at 753 n. 19, 104 S.Ct. at 3325 n. 19; *California Ass'n of the Physically Handicapped, Inc. v. FCC,* 778 F.2d 823, 825 n. 7 (D.C.Cir.1985). Redressability examines whether the relief sought, assuming that the court chooses to

grant it,[1] will likely alleviate the particularized injury alleged by the plaintiff. *See Simon*, 426 U.S. at 38–39, 96 S.Ct. at 1924–25; *In Re Thornburgh*, 869 F.2d at 1511. Causation may thus be said to focus on whether a particular party is appropriate; redressability, on whether the forum is.

## I. How is standing analyzed in procedural-rights cases?

■ Although the particular nature of a case does not—and cannot—eliminate any of the "irreducible" elements of standing, the assertion of a procedural requirement may compel a court to pay particular attention to those components of standing that ensure the proper parties are before the court. The Supreme Court has recently noted that, in cases in which a party "has been accorded a procedural right to protect his concrete interests," the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury. *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7.

■ According to *Defenders of Wildlife*, a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was "designed to protect some threatened concrete interest" of the plaintiff. *Id.* at 573 n. 8, 112 S.Ct. at 2143 n. 8. In this type of case, which includes suits demanding preparation of an EIS, *see, e.g., Public Citizen v. NHTSA*, 848 F.2d 256, 270 n. 2 (D.C.Cir. 1988) (Silberman, J., dissenting) (noting that NEPA "confers a *procedural* right") (emphasis added), in order to show that the interest asserted is more than a mere "general interest [in the alleged procedural violation] common to all members of the public," *Ex Parte Lévitt*, 302 U.S. at 634, 58 S.Ct. at 1, the plaintiff must show that the government act performed without the procedure in question

will cause a distinct risk to a particularized interest of the plaintiff. The mere violation of a procedural requirement thus does not permit any and all persons to sue to enforce the requirement. *See Defenders of Wildlife*, 504 U.S. at 572–73, 112 S.Ct. at 2142–43; *Schlesinger*, 418 U.S. at 223, 94 S.Ct. at 2933; *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 258–60 (D.C.Cir. 1983) (allegation of improper process by an agency does not grant standing absent assertion of some personal injury).

■ Nor does an alleged procedural violation by the government assure that the government is a proper defendant in a procedural-rights case. Although the Supreme Court has expressly declined to examine whether proper execution of the omitted procedure will likely prompt a modification of the government's action, *see Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7, the Court has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest. *See infra* section II.B. In fact, as *Defenders of Wildlife* repeatedly identified the "particularized injury" resulting from the construction of a dam that was licensed without an EIS as part of the injury necessary for EIS standing, *see* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7, that decision confirms that a prospective plaintiff must demonstrate that the defendant caused the particularized injury, and not just the alleged procedural violation. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n. 6 (9th Cir.1995) (observing that *Defenders of Wildlife* implied some causal link between the government action implicating the omitted procedure and the injury to the plaintiff's particularized interest), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996). To demonstrate standing, then, a procedural-rights plaintiff must

---

**1.** Because a review of standing does not review the merits of a claim, but the parties and forum involved, *see Flast*, 392 U.S. at 101, 88 S.Ct. at 1953, our assumption during the standing inquiry that the plaintiff will eventually win the relief he seeks, *see, e.g., In Re Thornburgh*, 869 F.2d

1503, 1511 (D.C.Cir.1989), does not, on its own, assure that the litigant has satisfied any element of standing. Any assumption as to the outcome of the litigation simply does not resolve the issues critical to a standing inquiry.

show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest.

## II. Do these appellants demonstrate standing?

■■■■■■ Turning to the case at bar, we note, as a preliminary matter, that, because NEPA does not offer a private right of action for individual plaintiffs seeking to enforce the EIS procedural requirement, a private individual must found his right to sue on some other basis. *See, e.g., Defenders of Wildlife,* 504 U.S. at 571–72, 112 S.Ct. at 2142 (finding a procedural right in the citizen-suit provision of the Endangered Species Act); *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882–83, 110 S.Ct. 3177, 3185–86, 111 L.Ed.2d 695 (1990) (noting that the APA may provide a right to sue for final agency actions that omit some procedural requirement). In this case, appellants have sought to enforce the NEPA procedural requirement through § 10(a) of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 702. In order to invoke judicial review of an alleged NEPA violation under the APA, a private individual must be "adversely affected or aggrieved ... within the meaning" of NEPA by some final agency action. *National Wildlife Federation,* 497 U.S. at 882–83, 883, 110 S.Ct. at 3185, 3186 (quoting 5 U.S.C. § 702 and noting that 5 U.S.C. § 704 denies judicial review under the APA unless the agency action is final). To be adversely affected within NEPA, appellants must at least demonstrate that they can satisfy all constitutional standing requirements and that their particularized injury is to interests of the sort protected by NEPA. *See Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 83 (D.C.Cir. 1991); *City of Los Angeles v. NHTSA,* 912

F.2d 478, 483 (D.C.Cir.1990) (Opinion of D.H. Ginsburg, J.).[2] Because there is no dispute that the agency action involved in this case is final, and that the injury alleged by appellants is of the sort that NEPA was "specifically designed" to protect, *see National Wildlife Federation,* 497 U.S. at 886, 110 S.Ct. at 3187–88, we are left to review only whether appellants have sufficiently demonstrated all of the traditional components of standing.[3]

Although, as noted, we assume for purposes of standing that an appellant will ultimately receive the relief sought, this assumption is not dispositive of our standing inquiry. *See supra* note 1. Standing does not examine whether the challenged tax credit will "significantly affect" the environment *in general,* which is a key issue on the merits of EIS litigation; *see* 42 U.S.C. § 4332(2)(C); rather, standing in an EIS matter focuses on whether appellants have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk, and whether the tax credit promulgated by the defendant is substantially likely to cause that demonstrable increase in risk to their particularized interest. *See City of Los Angeles,* 912 F.2d at 483–84 (opinion of D.H. Ginsburg, J.) (observing that a plaintiff must show a causal connection between the challenged change in federal regulation—and the incremental environmental effect the new regulation would allegedly cause—and the alleged injury to the particularized interests of the plaintiff).

■■■■■ The dissent objects that this standard will make it "virtually impossible" to bring this type of EIS suit, *see* Dissent at 675, but an inescapable result of any standing doctrine application is that at least some disputes will not receive judicial review. That analysis of a party's standing should

---

**2.** Judge D.H. Ginsburg found that certain parties had standing and wrote the opinion of the court on the merits of the claim, but disagreed with the majority on whether one particular plaintiff had standing. *See City of Los Angeles,* 912 F.2d at 482–85.

**3.** We, of course, do not concede—or even need to address—the dissent's repeated suggestion that our analysis somehow violates "Congress's deter-

mination" to provide a private cause of action to individuals alleging some procedural lapse under 42 *U.S.C.* § 4332, *see* Dissent at 684, as Congress did not expressly create this right in NEPA. *See infra* note 5. As standing limits congressional authority to order judicial review as well as the courts' ability to conduct such review, denial of standing cannot be thought to obstruct proper statutory commands.

sometimes dictate this result is not a reason to reject either the result or the analysis. *See, e.g., Schlesinger,* 418 U.S. at 226–27, 228, 94 S.Ct. at 2934–35, 2935; *United States v. Richardson,* 418 U.S. 166, 179–80, 94 S.Ct. 2940, 2947–48, 41 L.Ed.2d 678 (1974). Though we will not attempt to describe the various hypotheticals in which a party may still demand an EIS, we have no doubt that this standard will not uniformly preclude EIS suits. For instance, the example suggested by the Supreme Court in *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7—an EIS suit by a party whose home lies directly upstream of a proposed dam that was approved without an EIS—would still easily clear the standard articulated here. On the other hand, a plaintiff seeking to challenge a governmental action with alleged diverse environmental impacts may have some difficulty meeting this standard, but that difficulty stems from the nature of the plaintiff's claim, which is premised on an alleged injury that is itself difficult to locate, not some flaw in the standard.

For, contrary to the dissent's assertions, *see* Dissent at 675, the proof required by the standard is grounded firmly in the law. The standard established by this decision requires the bare minimum necessary to assure that a court hear only EIS disputes over which it may constitutionally maintain jurisdiction. The standard requires a particularized injury—an increased risk to a personal interest of a plaintiff—as demanded by a long line of standing precedent. *See, e.g., Defenders of Wildlife,* 504 U.S. at 560–63, 112 S.Ct. at 2136–38; *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972). It also requires this injury to be demonstrable, a prerequisite necessitated by the well-established rule that a plaintiff must *demonstrate* standing. *See, e.g., Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136–37; *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991); *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 546 & n. 8, 106 S.Ct. 1326, 1333–34 & n. 8, 89 L.Ed.2d 501 (1986). It further requires the plaintiff to show that the demonstrated particularized injury is fairly traceable to the agency act allegedly implicating the EIS. *See supra* at

664 (citing *Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142–43 n. 7). And it requires, as well established in our precedent, that this challenged act is substantially probable to cause the demonstrated particularized injury. *See, e.g., Kurtz,* 829 F.2d at 1143–44. These requirements, while sufficient to maintain the constitutional demand of standing, fall far short of requiring an EIS plaintiff to "conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." Dissent at 675 (quoting *City of Davis,* 521 F.2d at 671).

■■■■ Appellants in this case premise their claims of particularized injury and causation on a lengthy chain of conjecture. In brief, appellants contend that the tax credit will cause more ETBE production, which in turn will cause more ethanol production, which consequently will cause more production of the corn and sugar necessary for ethanol, which will then cause more agricultural pollution, which, as this pollution is likely to occur on farmland bordering wildlife areas appellants visit, is also likely to harm the areas visited by appellants. As we are reviewing a motion for summary judgment, we require specific facts, not "mere allegations," to substantiate each leap necessary for standing. *Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136–37. Because appellants have not adequately demonstrated either an injury to their particularized interest or that defendant's actions created a "substantial probability" of this injury, *see, e.g., Kurtz,* 829 F.2d at 1143–44, we conclude that they lack standing to sue for preparation of an EIS.

### A. Did appellants demonstrate injury?

■■■ To demonstrate injury sufficient for standing, appellants must show that the omission or insufficiency of an EIS may cause the agency to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts that imperil appellants' particularized interest. *See City of Los Angeles,* 912 F.2d at 483–84 (opinion of D.H. Ginsburg, J.). Previous standards in this area articulated within this circuit have not always clearly stated the

need for an EIS plaintiff to show that the government action that implicated the allegedly violated procedural requirement would subject a particularized interest of the plaintiff, rather than the environment in general, to increased risk.

For example, the majority of the panel in *City of Los Angeles* indicated that, to demonstrate injury sufficient for standing, an EIS plaintiff must show only that the omission of an EIS may cause the agency to overlook a "reasonable risk [of] environmental harm [that] may occur," as long as that plaintiff had "a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have." *Id.* at 492 (Wald, C.J., for the court). Although this two-pronged expression of the injury threshold in NEPA cases outlines important standing concerns, its structure added an unnecessarily broad inquiry—did the challenged action demonstrably increase the risk of some general environmental harm?—to the more narrow, and more pertinent, standing question of whether the underlying government act demonstrably increased some specific risk of environmental harm to the interests *of the plaintiff.*

■ The presence of a particularized risk of injury to the plaintiff's interests requires even more exacting scrutiny when the challenged government action is not one located at a particular "site," as was the action in the case from which *City of Los Angeles* imported its standard, *see City of Davis v. Coleman,* 521 F.2d 661, 671 (9th Cir.1975), *as cited in City of Los Angeles,* 912 F.2d at 482, but instead involves a broad rulemaking, as present in *City of Los Angeles* and this case. In the case of broad rulemaking, a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause. Nor is it enough, as the dissent wrongly and repeatedly suggests, *see* Dissent at 679, 680, that a plaintiff show that his particularized interest is merely more likely to sustain injury than some other person's interest.[4] Instead, in reviewing an EIS claim, a court must examine whether the demonstrably increased risk of serious environmental harm shown actually threatens the plaintiff's particular interests before that plaintiff may have a particularized injury sufficient for standing.

■ Appellants thus have rightly sought to demonstrate that the ETBE tax credit poses a demonstrably increased risk of injury to particular wildlife areas in Minnesota, Michigan, and Florida that they, or their members, use and enjoy. Appellants, however, have not demonstrated that individual corn or sugar farmers in these areas will affirmatively respond to the tax credit by significantly increasing production. *See, e.g., Florida Audubon Soc.,* 54 F.3d at 887 (Sentelle, J., dissenting). Instead, appellants, through expert testimony, contend that the tax credit will create a general risk of serious environmental harm by encouraging farmers throughout the United States, and thus, by implication, farmers near the wildlife areas appellants visit, to increase production in a manner that will increase agricultural pollu-

---

4. Such analysis ignores that an injury-in-fact sufficient for constitutional standing must demonstrate at least two fundamental characteristics. First, the injury must be demonstrated to be to the particularized interests of the plaintiff. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 508, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343 (1975). Second, the plaintiff must show that he is not simply injured as is everyone else, lest the injury be too general for court action, and suited instead for political redress. *See, e.g., Richardson,* 418 U.S. at 176–80, 94 S.Ct. at 2946–48. Although the dissent's "more likely than the next plaintiff" analysis may have some use in determining whether the injury asserted is too general for standing—and thus aid in determining whether a demonstrated injury satisfies the second requirement—it does not address the critical first criterion. As the "geographic nexus" test at issue here was in fact intended to ensure that a plaintiff's injury met this first criterion of being particularized and personal, an analysis of that test that does not actually require the plaintiff to demonstrate that such particularity must be invalid. That the dissent thinks otherwise perhaps also illustrates that it has not yet come to grips with the injury at issue in determining standing in this type of suit. The injury is not merely the procedural violation, but the harm caused by the underlying act. Part IIB *infra.* This underlying injury thus must also be particularized, not only to guarantee that the grievance is not too general for constitutional standing, but that the plaintiff truly has a personal stake in the matter.

tion that, in turn, will damage the wildlife areas.

We cannot treat such speculation as sufficient for standing. *See, e.g., Simon,* 426 U.S. at 42–46, 96 S.Ct. at 1926–28; *United Transportation Union v. ICC,* 891 F.2d 908, 911–13 (D.C.Cir.1989), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990) (rejecting allegations that cannot be described as true or false as too speculative for standing). Whatever the possible environmental impacts of the ETBE tax credit, appellants have not provided competent evidence that corn farmers in particular areas of Minnesota or Michigan or sugar producers in particular regions of Florida will grow their crops in such a fashion as to lead to greater quantities of pesticide use and erosion than already exist so as to pose a significantly increased risk to the lands used by these appellants because of the presence of that credit. Even if the coming years witness some increased cultivation of land in the United States, appellants have not demonstrated that this increased cultivation would occur on land adjacent to the property in Minnesota or elsewhere that any appellants visit. Because appellants have not demonstrated such a geographic nexus to any asserted environmental injury, we cannot hold that they have standing to sue.

### B. Have appellants demonstrated causation?

As in all cases, standing in an EIS suit requires adequate proof of causation. The conceptual difficulty with this requirement, in this type of case, is that an adequate causal chain must contain at least two links: one connecting the omitted EIS to some substantive government decision that may have been wrongly decided because of the lack of an EIS and one connecting that substantive decision to the plaintiff's particularized injury. The first link in this causal chain foreshadows the issue of redressability. *See, e.g., Competitive Enterprise Inst. v. NHTSA,* 901 F.2d 107, 113 (D.C.Cir.1990); *Mideast Systems and China Civil Const. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1177 (D.C.Cir.1986). The second link addresses what often proves the more critical causation

question in this type of case. During past consideration of NEPA standing by panels of this circuit, however, our precedent has largely focused on only the first link of an EIS causal chain, or whether the would-be plaintiff had demonstrated a "reasonable likelihood that if [a federal actor] performed an EIS, it would arrive at a different conclusion about" undertaking the major action at issue. *City of Los Angeles,* 912 F.2d at 497 (opinion of Wald, C.J., for the court); *see also Florida Audubon Soc.,* 54 F.3d at 882.

This abridged causation analysis is incomplete in that it views the injury at issue in an EIS suit to be, at bottom, only the procedural violation. The ultimate injury this causation analysis tries to link to the defendants' actions is "the risk that serious environmental harms were overlooked" in promulgating the ETBE tax credit without an EIS. *Florida Audubon Soc.,* 54 F.3d at 883. In other words, the key injury is truly the omission of the EIS, not whether the tax credit will in fact injure the plaintiffs' particularized interest. *See id.* at 882. This view of injury, and the view of causation it implies, does not conform to the Supreme Court's discussion of procedural-rights standing in *Defenders of Wildlife.*

In *Defenders of Wildlife,* the Court admitted that a procedural right may permit a litigant to assert that right "without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n. 7, 112 S.Ct. at 2142–43 n. 7. Yet, if the sole injury at issue for "procedural rights" standing was simply some type of procedural violation, even only one that may risk the party's particularized interest, the Court need not have modified the normal standard of immediacy or redressability. According to any demonstrable application of the "normal" standards, a procedural violation is surely imminent, as it has already happened, and easily redressable, as a court may order the agency to undertake the procedure. By instead suggesting that the "normal standards" do not apply in these cases, the Court verified that the showing of injury necessary to determine whether a procedural-rights plaintiff has standing is not satisfied by the existence of a mere procedural violation, but also requires a

"particularized injury" resulting from the government's substantive action that breached the procedural requirement.

Because the Supreme Court thus considered the "particularized injury" as the normal focus of standing analysis even in procedural-rights cases, we must examine the causal connection between the substantive government action and the asserted injury to the plaintiff's particularized interest. *Defenders of Wildlife* again confirms our result. *See id.* That case specifically noted that, in EIS suits, a court should not review redressability—whether the preparation of the EIS might alter the decision to license the dam (or, here, grant the tax credit). Yet, that issue resembles what the *City of Los Angeles* and *Florida Audubon Soc.* majorities actually examined, albeit under the guise of causation. *See, e.g., City of Los Angeles,* 912 F.2d at 497 (opinion of Wald, C.J., for the court). We cannot accept that *Defenders of Wildlife* intended to encourage courts to review under the label "causation" what that same decision indicated they should not review in considering redressability.

▆ To prove causation, a plaintiff seeking the preparation of an EIS must demonstrate that the particularized injury that the plaintiff is suffering or is likely to suffer is fairly traceable to the agency action that implicated the need for an EIS. In other words, unless there is a substantial probability, *see Kurtz,* 829 F.2d at 1143–44, that the substantive agency action that disregarded a procedural requirement created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of the plaintiff, the plaintiff lacks standing. To the extent *City of Los Angeles,* 912 F.2d at 495–98 (opinion of Wald, C.J., for the court), or other decisions are inconsistent with this requirement, they are overruled.

▆ In fact, once it is understood that an EIS plaintiff must demonstrate a particularized injury to its personal interests as well as a procedural violation, the necessity of showing causation for that particularized injury becomes self-evident. Not to require that a plaintiff show that its particularized injury resulted from the government action at issue would effectively void the particularized injury requirement. After all, any plaintiff may allege an injury to its own interests if that injury need not be caused by any act of the defendant. *Cf. Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148–49, 35 L.Ed.2d 536 (1973) (emphasizing that the Supreme Court has "steadfastly adhered to the requirement that … federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action"). By thus requiring some real showing of causation, we ensure that NEPA cannot foster a procedural right "in the air," *Giles v. Harris,* 189 U.S. 475, 486, 23 S.Ct. 639, 641–42, 47 L.Ed. 909 (1903) (Holmes, J.), or a right that is distinct from any concrete injury. *See Defenders of Wildlife,* 504 U.S. at 573 n. 8, 112 S.Ct. at 2143 n. 8.[5]

In this case, even if we were to assume that appellants have provided specific factual support for the proposition that the wildlife areas they enjoy suffer a demonstrably increased risk of agricultural pollution in the future, appellants have not shown that such particularized injury would be fairly traceable to the passage of the tax credit, as is necessary for standing. *See City of Los Angeles,* 912 F.2d at 484 (opinion of D.H. Ginsburg, J.); *see also Simon,* 426 U.S. at 40–42, 96 S.Ct. at 1925–26. For the tax credit to pose a substantial probability of a demonstrably increased risk of particularized environmental damage, the credit must prompt third-party fuel producers to undertake the acquisition of production facilities for ETBE and begin to produce ETBE in such quantities as to increase the demand for ethanol

---

5. Our view of causation also protects the purposes of NEPA. The purpose of NEPA's EIS requirement is to ensure that federal agencies account for environmental costs and effects of a major action before undertaking that action, not to provide individuals who can demonstrate no more than "probable cause" of some risk of environmental injury from federal agency action

a means of forcing the agency to discover whether its action, in fact, poses any actual risk of causing such harm. The omission of a private right of action for enforcing the EIS requirement in NEPA, *see National Wildlife Federation,* 497 U.S. at 882, 110 S.Ct. at 3185, confirms this more sensible view of NEPA and of the showing of causation necessary for EIS standing.

from which the ETBE is derived. This increased demand for ethanol must then not simply displace existing markets for currently-produced ethanol, but in fact increase demand for the agricultural products from which ethanol is made. Again, this demand must not be filled by existing corn or sugar supplies, but instead spur new production of these products by farmers, who must be shown to have increased production at least to some measurable extent because of the tax credit, rather than any one of other innumerable farming considerations, including weather, the availability of credit, and existing subsidy programs. Moreover, any agricultural pollution from this increased production must be demonstrably more damaging than the pollution formerly caused by prior agricultural production or other prior use of land now cultivated because of the ETBE tax credit. Finally, the farmers who have increased production (and pollution) as a result of the tax credit must include farmers in the regions visited by appellants, and they must use techniques or chemicals in such fashion and to such extent as to threaten a demonstrably increased risk of environmental harm to the wildlife areas enjoyed by appellants.

Such a protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury. Most, if not all, of the individual links in the chain alleged by appellants depend on some allegation that cannot be easily described as true or false; as noted, we routinely refuse to permit such predictive assumptions to establish standing. *See United Transportation Union,* 891 F.2d at 911–13. Also, most, if not all, of these links inescapably presume certain "independent action[s] of some third party not before th[is] court." *Simon,* 426 U.S. at 42, 96 S.Ct. at 1926. The Supreme Court itself has noted the improbability of establishing the necessary likelihood of some result when that result depends on predicting the acts of even a single "interest group" who is unrepresented in the instant litigation, especially when that group, like the farmers, ethanol distributors, or ETBE producers in this case, is actually composed of dozens of individual actors, each of whom must react to other market or regulatory inputs. *See id.* at 42–46, 96 S.Ct. at 1926–28.

■ The causal connection asserted by appellants here, however, is far weaker than even the one alleged in *Simon.* In *Simon,* only the independent acts of one "interest group"—hospitals—eliminated the possibility of proving causation. *See id.* As in a later case in which the Supreme Court denied standing, *see Allen,* 468 U.S. at 757–59, 104 S.Ct. at 3327–29, these appellants' causal chain relies on the acts of not one, but several groups of third parties—including ETBE producers, ethanol distributors, and farmers in Florida, Minnesota, and Michigan—none of whom are before this court. The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true. *See generally California Ass'n of the Physically Handicapped, Inc.,* 778 F.2d at 829 n. 4 (Wald, J., dissenting) (explaining that the "double layer" of speculation in *Allen* made its causal chain far weaker than the chain the Supreme Court rejected in *Simon).* As in *Allen,* then, the presence and number of third-party links in this causal chain independently corroborate that appellants' claim of causation is "entirely speculative" and insufficient for standing. *Cf. Simon,* 426 U.S. at 46, 96 S.Ct. at 1928 (Stewart, J., concurring) (observing that suits challenging a third party's taxes are not justiciable, except for First Amendment challenges).

■ Nor do the theories or testimony advanced by appellants adequately bridge the uncertain ground found in any causal path that rests on the independent acts of third parties. In particular, the statements of various members of Congress prophesying that the new tax rule will stimulate increased domestic agricultural production do not demonstrate causation. We do not defer to the views of the IRS or of Congress or its individual members in determining whether a particular rule will cause injury to a particular plaintiff or as proof of any causal chain necessary for standing. *See The Freedom Republicans, Inc. v. FEC,* 13 F.3d 412, 417 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 84, 130 L.Ed.2d 36 (1994); *Dellums v.*

*NRC,* 863 F.2d 968, 978–80 (D.C.Cir.1988). That members of Congress may have agreed with agricultural and alternative fuel interests that the enactment of the ETBE tax credit might increase demand for corn or sugar does not suffice to establish that the credit is substantially likely to stimulate production of ETBE, or that that is substantially likely to stimulate ethanol production, or that that is in turn substantially likely to result in increased domestic agricultural production, or that that is then substantially likely to risk some environmental injury to areas that appellants enjoy or to tap water that appellants use.

We are especially reluctant to blindly accept congressional prophesy as to economic matters when, as here, sound economic reasoning may well suggest a contrary result. In this case, it is far from clear that a tax credit for ETBE will stimulate a demand for ethanol, as ETBE, while made partly of ethanol, is also an ethanol *substitute.* Other steps along appellants' causal path also lack support, despite the dissent's contention to the contrary. *See* Dissent at 682. For instance, the record does not detail how farmers who might affect these appellants' interests may use additional agricultural chemicals, which is a critical factor in determining whether these chemicals pose any risk of environmental injury. Jonathan Tolman, COMPETITIVE ENTERPRISE INSTITUTE, FEDERAL AGRICULTURAL POLICY: A HARVEST OF ENVIRONMENTAL ABUSE 12 (1995), *as included in Appellants' Addendum 2* ("The addition of larger quantities of agricultural chemicals to crops does not directly imply increased environmental harm."). Nor does any evidence answer the telling fact that, several years after the promulgation of the new rule, ETBE production in the United States still demanded less than two percent of total domestic ethanol production. In the face of such record evidence that the new tax rule has not had a substantial impact even on ETBE production, we cannot credit rosy congressional projections as to the far more tenuous link between the rule and increased agricultural production or appellants' unconvincing allegations tying the rule to increased agricultural pollution.

Although the dissent claims support for its conclusions from *Duke Power Co. v. Carolina Env. Study Group,* that decision does not contradict our result. *See* 438 U.S. 59, 75–77, 98 S.Ct. 2620, 2631–33, 57 L.Ed.2d 595 (1978). The Supreme Court in *Duke Power* reviewed a lower court's decision to grant standing to parties challenging an act that limited the liability of companies associated with a nuclear power facility because a nuclear power plant, which harmed the parties, would not have been built in the absence of the act. *See id.* at 73–74, 98 S.Ct. at 2630–31. The evidence set forth in support of this admittedly stretched chain of causation, however, was still far stronger on several grounds than is the evidence before us. *See id.* at 75–77, 98 S.Ct. at 2631–33. A brief comment as to a single one of these differences suffices to distinguish *Duke Power* from this matter. In *Duke Power,* the challenging parties put forth testimony from Duke Power officials, stating that they would have had to consider withdrawing their plans for new nuclear plants in the absence of the act. *See id.* at 76–77, 98 S.Ct. at 2632–33. In this case, plaintiffs have put forward no parallel testimony supporting each step of their attenuated causal path. *No* corn or sugar farmer in the record has suggested any link between the ETBE tax credit and increasing his level of production, never mind a farmer whose actions would actually harm the interests of the plaintiffs. Even at the very first link of appellants' chain, a link necessary for the rest of the chain to survive, statements of a prospective ETBE producer instead expressly deny that the tax credit "prompted" his decision to begin ETBE production. *Arco Plant in Texas Soon to Produce MTBE or ETBE,* Dow Jones Int'l News, Oct. 16, 1995, *as included in Appellee's Addendum A.* When it is remembered that the evidence in *Duke Power* was stronger in other respects, and that the Supreme Court in that case was merely reviewing the decision to grant standing for *clear error, see Duke Power,* 438 U.S. at 77, 98 S.Ct. at 2632–33, it becomes evident that *Duke Power* does not affect our result here.

█ And though the chain of causation alleged by appellants is not perceptibly more improbable than that alleged in *United*

*States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), that sole case provides little reason to doubt our result. Not only has the Supreme Court itself declared it an outlier, *see Lujan v. National Wildlife Federation*, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990), but *SCRAP* was heard on its pleadings, at which point a reviewing court "presumes that general allegations embrace those specific facts that are necessary to support the claim." *Id.* As we review a grant of summary judgment here, we need not accept appellants' alleged chain of events if they are unable to demonstrate competent evidence to support each link. *See Defenders of Wildlife*, 504 U.S. at 561, 112 S.Ct. at 2136–37.

## CONCLUSION

The federal judiciary is not a back-seat Congress nor some sort of super-agency. The absence of standing for these appellants means that they cannot get their foot in the door of the courthouse to pursue their avowed goal of environmental protection. The worthiness of that goal, however, cannot and should not blind the federal judiciary to the strictures of our own constitutional role—the hearing of only actual cases between proper litigants. *See Schlesinger*, 418 U.S. at 218, 222, 94 S.Ct. at 2930, 2932 (quoting *Flast*, 392 U.S. at 131, 88 S.Ct. at 1968–69 (Harlan, J., dissenting)).

In this case, appellants have not demonstrated that either they or the defendants are the proper parties for this EIS claim. Unless an EIS plaintiff at least shows, through competent and sufficient evidence, that the omission of an EIS may cause a government actor to overlook a demonstrably increased risk of injury to a personal and particularized environmental interest of the plaintiff, *and* that there is a substantial probability that the government act allegedly implicating the EIS requirement will cause that demonstrably increased risk of injury, that

plaintiff cannot have standing. These appellants, however, have not established that they have suffered or will suffer an injury to their particularized interest. Also and alternatively, appellants have not demonstrated that it is substantially probable that the promulgation of the tax credit would cause any such injury. We thus affirm the district court.

*Affirmed.*

BUCKLEY, Circuit Judge, concurring:

I agree with the dissent that the court's opinion imposes an unduly heavy burden on appellants to establish standing in a NEPA challenge. Quite simply, the court now requires that a litigant be able to establish the nature and likelihood of the environmental injury that it is the purpose of an environmental impact statement to identify. We had it essentially right in *City of Los Angeles*. Nevertheless, because I agree that appellants have failed to establish the necessary "nexus" between the tax credit and the injuries they foresee, I must concur in the judgment of the court. I say "must" because I regret that the court has adopted new criteria for the establishment of standing in NEPA cases that will erode the effectiveness of one of the most important environmental measures of the past generation.

ROGERS, Circuit Judge, with whom HARRY T. EDWARDS, Chief Judge, WALD and TATEL, Circuit Judges, join, dissenting:

The court holds that appellant Diane Jensen lacks standing to challenge under the National Environmental Policy Act of 1969 ("NEPA") the failure of the Secretary of the Treasury and the Commissioner of the Internal Revenue Service (together "the Secretary") to prepare an environmental impact statement ("EIS") prior to promulgating a final rule to allow a tax credit for an alternative fuel additive known as ethyl tertiary butyl ether ("ETBE").[1] In my view, the

1. Because I conclude that Ms. Jensen has standing to seek declaratory and injunctive relief requiring the Secretary to prepare an EIS before implementing the tax credit at issue, I have no occasion to address the claims to standing for the

other appellants: the Florida Audubon Society, the Florida Wildlife Federation, and the Friends of the Earth. Appellants forthrightly state that if any one of them has shown sufficient evidence to withstand summary judgment on standing, the

court has misapplied the doctrine of standing to the assertion of a procedural right, such as the preparation of an EIS, with the consequence that it will be effectively impossible for anyone to bring a NEPA claim in the context of a rulemaking with diffuse impact. Because this result is inconsistent with the language of the congressional statute and is not required by Article III of the Constitution, I respectfully dissent.

## I.

In order to have standing to sue, a plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). A plaintiff presents a justiciable "case or controversy" under Article III only if the plaintiff meets three constitutional standing requirements. First, the plaintiff's "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; second, that injury must be fairly traceable to the defendant's conduct; and third, the judicial relief requested must be likely to redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted); *see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982). Because NEPA contains no private right of action, the plaintiffs in the instant case have brought suit under § 10(a) of the Administrative Procedure Act (APA), 5 U.S.C. § 702 (1994). They must therefore show also that the interest they seek to protect falls " 'arguably within the zone of interests to be protected or regulated by' " NEPA. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 396, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987) (quoting *Association of Data Processing*

court need not consider the standing of other appellants. *See Watt v. Energy Action Educ. Found.,* 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70

*Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970)).

NEPA requires federal agencies, before undertaking "major ... actions significantly affecting the quality of the human environment," to prepare what has become known as an environmental impact statement. NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. §§ 1502.1–.25 (1995).

The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989). The court acknowledges that appellants have a "procedural right" under NEPA. *See* Majority Opinion ("Maj. Op.") at 663–665. In other words, Congress has made the risk of environmental harm from the government's failure to prepare an EIS a legally cognizable injury. Courts will give effect to that congressional determination in standing cases: "The actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.' " *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148–49 n. 3, 35 L.Ed.2d 536 (1973)); *see also Lujan v. Defenders of Wildlife,* 504 U.S. at 578, 112 S.Ct. at 2145–46; *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); *see generally* William A. Fletcher, *The Structure of Standing,* 98 YALE L.J. 221, 253–62 (1988).

L.Ed.2d 309 (1981); *National Mining Ass'n v. United States Dep't of Interior,* 70 F.3d 1345, 1349 (D.C.Cir.1995).

In the past, this circuit has applied a two-part test to claims of standing under NEPA, requiring the plaintiff to show that the agency's failure to prepare an EIS " 'creat[es] a risk that serious environmental harms will be overlooked' " and that he " 'ha[s] a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.' " *City of Los Angeles*, 912 F.2d 478, 492 (D.C.Cir.1990) (quoting *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir.1975)). The first part of this test asks whether the plaintiff has suffered a cognizable injury under NEPA—that is, whether NEPA affords him a "procedural right." The second part of the test asks whether the plaintiff has suffered injury in fact for standing purposes. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1500 n. 5 (9th Cir.1995) (stating that the "geographic nexus" test is equivalent to "the 'concrete interest' test of *Lujan*"), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996). Although the court criticizes the *City of Los Angeles* test for not clearly requiring a showing of increased risk to "a particularized interest of the plaintiff, rather than the environment in general," Maj. Op. at 666–67, the "geographic nexus" test instantiates in the NEPA context precisely the showing of injury in fact that the court also requires.[2] It is consistent, moreover, with instruction from the Supreme Court. *See Lujan*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7.

In cases involving a procedural right, such as the preparation of an EIS under NEPA, it is inherently speculative whether the decisionmaker will reconsider the decision that causes the plaintiff's injury in fact. Thus, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572, 112 S.Ct. 2130, 2142, 119 L.Ed.2d 351 (1992), the Supreme Court acknowledged the special nature of "a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs (*e.g.*, ... the procedural requirement for an environmental impact statement before a federal facility is constructed next door to them)." In such a case, the Supreme Court declared, "[t]he person who has been accorded a procedural right to protect his [or her] concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* at 572 n. 7, 112 S.Ct. at 2142 n. 7. By analogy, appellants need not show that the preparation of the EIS would lead the Secretary to rescind the tax credit, nor that the environmental harm threatened by the tax credit is imminent.

As the opinion for the court states, Maj. Op. at 668, the plaintiff in a NEPA case must also establish that her injury is fairly traceable to the underlying governmental action for which an EIS was not prepared.[3] *See Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976); *Warth v. Seldin*, 422 U.S. 490, 504–05, 95 S.Ct. 2197, 2207–08, 45 L.Ed.2d 343 (1975). The causation inquiry in a NEPA case, however, must be conducted in light of the procedural injury that the statute creates. Because "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before," *Lujan*, 504 U.S. at 580, 112 S.Ct. at 2146–47

---

**2.** There is no occasion to rely on appellants' alternative theory that they have suffered "informational injury." *See Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 84 (D.C.Cir.1991) ("[W]e have never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury,' that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain.").

**3.** In previous cases, this circuit has held that the causation element of standing can be satisfied by " 'the prospect that the [agency] would rescind its [underlying action] were the environmental consequences of the [underlying action] spelled

out in more detail in an EIS: ... this would supply the required causal nexus between the agency's action—failure to prepare an EIS—and petitioners' "environmental" injury.' " *City of Los Angeles*, 912 F.2d at 496 (quoting *Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 263 n. 27 (D.C.Cir.1988)). The court properly abandons that approach, *see* Maj. Op. at 668, in light of Supreme Court cases, decided after the Ninth Circuit decision from which this circuit drew its NEPA standing test, that establish the causation element of standing. The panel opinion conducted the proper causation analysis, albeit under a different rubric. 54 F.3d at 878–80.

(Kennedy, J., concurring in part and concurring in the judgment), the nature of the causation inquiry is shaped by the procedural right asserted under NEPA.[4] *See Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1516 (9th Cir.1992) ("The standing examination ... must focus on the likelihood that the defendant's action will injure the plaintiff *in the sense contemplated by Congress.*"). As this court has explained, NEPA "includes a strong mandate to anticipate, and where possible, avoid environmental crises through the explanatory and research device of an EIS." *City of Los Angeles,* 912 F.2d at 496. The irony of the rule announced by the court today is that it "in essence ... require[s] that the plaintiff conduct the same environmental investigation that he seeks in his suit to compel the agency to undertake." *City of Davis,* 521 F.2d at 671; *see also* STEPHEN G. BREYER & RICHARD B. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 1107 (2d ed. 1985) ("NEPA has been judicially construed as an essentially procedural statute designed to generate, through an EIS, information on the environmental effects of a proposed action. To require plaintiffs to show what those effects are as a prerequisite to requiring that an EIS be performed seems inconsistent with the basic purpose of NEPA.").

## II.

The opinion for the court imposes so heavy an evidentiary burden on appellants to establish standing that it will be virtually impossible to bring a NEPA challenge to rulemakings with diffuse impacts. The quantum of proof that the court requires finds no support in the procedural rules on summary judgment, nor in the case law on standing. It

4. Nine of the ten judges who took part in *Center for Auto Safety v. Thomas,* 847 F.2d 843 (D.C.Cir. 1988) (en banc), agreed with this proposition. *See id.* at 856 (opinion of Wald, C.J.); *id.* at 874 (opinion of Buckley, J.) (stating that Congress cannot "conclusively establish[ ]" causation, but "Congress' understanding might affect the *quantum* of proof that the [plaintiff] must provide").

5. The circuits are divided over the issue whether challenges to forest management plans under NEPA and the National Forest Management Act, 16 U.S.C. §§ 1600–1614 (1994), are justiciable

also places this circuit in conflict with the Ninth Circuit, which has frequently found standing in cases similar to this one.[5] *See Douglas County,* 48 F.3d at 1499–1501; *Resources Ltd. v. Robertson,* 35 F.3d 1300, 1302–03 (9th Cir.1993); *Salmon River Concerned Citizens v. Robertson,* 32 F.3d 1346, 1351–55 (9th Cir.1994); *Portland Audubon Soc'y v. Babbitt,* 998 F.2d 705, 707–08 (9th Cir.1993); *Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 702–03 (9th Cir.1993); *Idaho Conservation League,* 956 F.2d at 1513–18.

Our review of the district court's grant of the Secretary's motion for summary judgment on standing is *de novo. Harbor Ins. Co. v. Stokes,* 45 F.3d 499, 501 (D.C.Cir.1995). To survive such a summary judgment motion, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan v. Defenders of Wildlife,* 504 U.S. at 561, 112 S.Ct. at 2136–37; *see also Lujan v. National Wildlife Fed'n,* 497 U.S. at 889, 110 S.Ct. at 3189. Of course, the Secretary bears the burden "to show initially the absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *see generally* 10A Charles A. WRIGHT, ARTHUR R. MILLER & Mary Kay KANE, FEDERAL PRACTICE AND PROCEDURE § 2739 (2d ed.1983). Because appellants have presented ample evidence to show that they have suffered an injury in fact, fairly traceable to the Secretary's action, and the Secretary has presented no genuine issue of material fact as to Ms. Jensen's standing, appellants are entitled to summary judgment on the standing issue.

when the government has yet to develop site-specific projects implementing the plan. *Compare Sierra Club v. Marita,* 46 F.3d 606, 610–14 (7th Cir.1995) *and Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1515–16 (9th Cir.1992) (yes) *with Wilderness Soc'y v. Alcock,* 83 F.3d 386, 389–91 (11th Cir.1996) *and Sierra Club v. Robertson,* 28 F.3d 753, 757–60 (8th Cir.1994) (no). That consideration is not present in the instant case because the Secretary will not take any site-specific action.

## A.

**The ETBE tax credit.** The statutory purpose of the tax credit, as well as the Secretary's rationale for extending the tax credit to ETBE, set the context for demonstrating the lack of merit to the Secretary's challenge to Ms. Jensen's standing.

In 1980, Congress enacted the Crude Oil Windfall Profit Tax Act, Pub.L. No. 96–223, § 232(b)(1), 94 Stat. 229, 273–75, in order "to encourage the development of energy sources other than petroleum products for use in motor fuels" by providing a refundable income tax credit on "alcohol (other than alcohol derived from petroleum, natural gas, or coal)" used in motor fuels. S.REP. No. 394, 96th Cong., 1st Sess. 91 (1979), *reprinted in* 1980 U.S.C.C.A.N. 410, 499–500. Section 40 of the Internal Revenue Code thus provides a tax credit of 60 cents for each gallon of alcohol used in the production of a "qualified mixture" of alcohol and gasoline. 26 U.S.C. § 40(a), (b)(1) (1994). ETBE is a chemical compound produced in a reaction between ethanol (an alcohol usually produced by fermenting sugar contained in crops such as corn, sugar beets and sugarcane) and isobutylene (a petroleum by-product); the ETBE is then typically blended with gasoline for use as a fuel. Before 1990, ETBE did not qualify for the § 40 tax credit because, chemically speaking, it is a compound rather than a "mixture" of ethanol and isobutylene. Without the tax credit, ETBE could not compete commercially with a similar fuel additive, methyl tertiary butyl ether. In 1988, sixty-one United States senators [6] urged the Secretary to announce that ETBE qualifies for the tax credit, explaining that "[b]y establishing the eligibility of the credit, commercialization can occur immediately, and, in accordance with the intent of the original Act, America's dependence on foreign oil can be further reduced."

In 1989, the Secretary issued a proposed rule that would re-interpret "qualified mixture" to include chemical compounds derived from alcohol. *See* Alcohol Fuels Credit; Definition of Mixture, 54 Fed.Reg. 48,639 (Nov. 24, 1989). Stating that the rule was based on "policy considerations," *id.* at 48,-639, the Secretary's notice indicated that the proposed ETBE tax credit would have five benefits:

> First, allowing the credit will increase the substitution of ETBE for other octane enhancers that cause more pollution. Second, it makes ETBE a more viable means of increasing the oxygen content of gasoline, which should help smooth the transition to oxygenated fuels in those areas that are not in compliance with carbon monoxide standards. Third, it encourages the substitution of ETBE-gasoline blends (gasohol). ETBE does not absorb water, which means it is easier to transport than gasohol, and it can be blended into the gasoline with less pollution than the "splash blending" of gasohol. Fourth, it *may increase the demand of domestic ethanol* because ETBE is easier to use than ethanol, *which would expand this alternative market for America's farmers.* Fifth, ETBE is a fuel, not just an octane enhancer, and it will displace some gasoline consumption. Substituting a renewable and domestically-produced fuel for imported petroleum will enhance national energy security and will improve the trade balance.

*Id.* at 48,640 (emphasis added). In comments submitted to the Secretary, the National Corn Growers Association stated that the new rule would "help open the door to a whole *new* market for the nation's corn farmer." Letter from Alan Kemper, President, National Corn Growers Ass'n, to the Commissioner of the Internal Revenue Service (Dec. 8, 1989).

In 1990, the Secretary promulgated a final rule. Identical to the proposed rule, it interpreted section 40's reference to a "qualified mixture" to include products derived from alcohol "even if the alcohol is chemically transformed in producing the product so that the alcohol is no longer present as a separate chemical in the final product, provided that there is no significant loss in the energy content of the alcohol." Alcohol Fuels Credit; Definition of Mixture, 55 Fed.Reg. 8946, 8946 (1990) (codified at 26 C.F.R. § 1.40–1

6. The letter was signed by all sixty-one senators who had been in the Senate when the Crude Oil Windfall Profit Tax Act was enacted in 1980 and continued in office in 1988.

(1995)). In the notice accompanying the final rule, the Secretary rejected the suggestion that NEPA required him to prepare an environmental impact statement because Treasury Directive 75–02, 45 Fed.Reg. 1828 (Jan. 8, 1980), provided a "categorical exception" from the EIS requirement for IRS regulations "interpreting, implementing, or clarifying" Internal Revenue Code provisions. 55 Fed.Reg. at 8947.

Appellants disagree, and they challenge the Secretary's failure to prepare an EIS before taking the non-site-specific government action that appellants assert is likely to cause widespread environmental harm. The only question now before the court is whether appellants have standing.

## B.

**Injury in fact.** Appellants have demonstrated concrete and particularized injury by establishing that they have a "geographical nexus" to the threatened environmental injury. The court rejects their showing of proof, however, on the ground that they "have not provided competent evidence that corn farmers in particular areas of Minnesota or Michigan or sugar producers in particular regions of Florida" will increase their crop production. Maj. Op. at 667–68. Unfortunately, the court ignores the voluminous evidence that appellants have provided.

In her sworn declaration, Ms. Jensen explained that she and her family regularly use and enjoy particular locations in Minnesota, including the Sherburne National Wildlife Refuge, Sand Dunes State Forest, and Lac Qui Parle Wildlife Area. At her deposition, in response to the government's request, she identified ten areas, with an average diameter of twenty-five miles, that she regularly visits for her recreational activities. In her declaration she stated that these activities include hiking, canoeing, cross-country skiing, birdwatching and photography, and fishing throughout undeveloped natural areas adjoining Minnesota land used for corn farming and susceptible to increased corn production. The Secretary does not dispute that Ms. Jensen has more than " 'some day' intentions" to visit these areas, *cf. Lujan v. Defenders of Wildlife*, 504 U.S. at 564, 112 S.Ct. at 2138, and that she has alleged that these particular locations, and not land in the general vicinity, are likely to be adversely affected by the ETBE tax credit, *cf. Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 887–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990).

Furthermore, Ms. Jensen has proffered unrefuted evidence that the ETBE tax credit will affect areas she uses. Based on her experience on several Minnesota environmental task forces, state environmental advisory groups, and the state Board of Water and Soil Resources,[7] Ms. Jensen states in her sworn declaration that local farmers, who now receive state subsidies to leave some land fallow and rotate fields, are likely to abandon the subsidy and develop these lands in order to take advantage of the tax credit. As a result, Ms. Jensen states, marginally productive lands, which require more fertilizer and pesticides to farm and are more susceptible to erosion, are likely to be cultivated. She further states that greater yields can be obtained from Minnesota farmland already devoted to corn farming through increased use of pesticides and fertilizer, which would threaten wildlife habitats by causing greater soil erosion and water pollution. Ms. Jensen also refers to meetings in which State representatives have advised her that the ETBE tax credit is likely to increase corn farming in Minnesota and that an EIS could destroy market opportunities for Minnesota corn. From this unrefuted evidence, the likelihood that the ETBE tax credit will stimulate increased corn production on lands neighboring

---

7. Since 1985, Ms. Jensen has been employed by, and since 1987 has been a co-director of, the Minnesota branch of Clean Water Action, a national environmental organization that advocates protection of natural resources. She was a member of a 1989 advisory group that prepared legislation (later adopted by the state legislature) to protect groundwater in Minnesota, and has served, by appointment, on three state environmental advisory groups. In addition, since 1989 she has been the Minnesota State Governor's appointee to the Great Lakes Protection Fund Board. From 1990 to 1992, she served as the Governor's appointee to the Minnesota Board of Water and Soil Resources, which administers the state soil and water conversation districts, county water planning and the state's farmland set-aside programs.

those used by Ms. Jensen, and the fact that Minnesota is the fourth-largest corn-producing state in the United States, it reasonably follows that Ms. Jensen uses lands likely to be affected by the ETBE tax credit.

Ms. Jensen's second basis for standing rests on the unrefuted evidence that the ETBE tax credit will affect her drinking water. In her affidavit, she states that the pesticide atrazine, which is commonly used on corn crops, can be found in groundwater as well as in drinking water. According to a national study that appellants have submitted, about 72 million pounds of atrazine were applied in 1992, of which over 60 million pounds were used on corn. National Center for Food and Agricultural Policy, *Pesticide Use in U.S. Crop Production* tbl. 18 (Feb. 1995). Given that, according to this study, 68% of acres planted with corn are treated with atrazine, *id.*, it is likely that increased corn production would be accompanied by increased use of atrazine. The Environmental Protection Agency, in initiating a Special Review of atrazine and related pesticides, has concluded that "atrazine is the most frequently detected pesticide in the ground water in the midwestern United States, including . . . Minnesota." 59 Fed.Reg. 60,412, 60,427 (Nov. 23, 1994). Appellants have also submitted a drinking-water study that shows that atrazine, which the Environmental Protection Agency has classified as a possible human carcinogen, was found in 58% of tap water samples collected between May 25 and July 1, 1995, in Minneapolis. Environmental Working Group, *Weed Killers By the Glass* 63 (Aug.1995). Because Ms. Jensen resides in the Minneapolis metropolitan area, it reasonably follows that Ms. Jensen's drinking water is likely to be affected by the ETBE tax credit.

It is true that Ms. Jensen has not pointed to a particular Minnesotan corn farmer whose possible increased corn production will injure the lands she uses or the water she drinks.[8] Maj. Op. at 671. But her showing

of a localized impact of the ETBE tax credit is more than sufficient to establish the requisite "geographical nexus." In *Oregon Environmental Council v. Kunzman,* 817 F.2d 484, 491–92 (9th Cir.1987), residents of Oregon challenged an EIS for a federal program for spraying gypsy moths. The court concluded that the plaintiffs "reside in a state with an actual gypsy moth problem and thus may challenge a nationwide EIS that is applicable to them." Just so, Ms. Jensen has shown that she is likely to be concretely affected by the ETBE tax credit in a way that distinguishes her from other potential plaintiffs; she seeks redress not for a generalized grievance, but for a particularized interest. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 573–74, 112 S.Ct. at 2143–44.

Because it cannot be disputed that Ms. Jensen has a concrete, particularized interest in the wildlife areas that she uses and in the water that she drinks, the remaining question is whether the threatened harm to her is sufficiently imminent. The reasoning in the opinion for the court, holding that appellants have not established injury in fact, Maj. Op. at 666–668, may be directed toward this requirement of imminence. *Cf. Wilderness Soc'y v. Griles,* 824 F.2d 4, 18 (D.C.Cir.1987) ("[T]he likelihood of injury, whether or not that likelihood depends upon a single event or a chain of events, is properly a concern of the personal injury inquiry, not the causation inquiry. . . ."). As the Supreme Court made clear in footnote seven of *Lujan v. Defenders of Wildlife,* however, a plaintiff asserting a procedural right need not wait for the threatened injury to befall her before bringing suit to force the government to conduct the procedure designed to protect the plaintiff's concrete interest. The "normal standards for . . . immediacy" are relaxed, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7, because NEPA injury entails simply the "risk of serious environmental harm," not the certainty of environmental harm. *See Salmon River Concerned Citizens v. Robertson,* 32 F.3d

---

**8.** Nor could Ms. Jensen produce such a farmer, given that the impersonal laws of supply and demand would increase corn production without the particular farmer being able to attribute the increase in production to demand for ETBE. Ms. Jensen has, however, produced statements

from the National Corn Growers Association, speaking on behalf of farmers, as well as evidence that elected officials in Minnesota expected that farmers would benefit from the ETBE tax credit.

1346, 1355 n. 14 (9th Cir.1994) ("There is no requirement that a plaintiff prove that an injury to his or her concrete interests *will* occur."); *Sierra Club v. Marita,* 46 F.3d 606, 611–12 (7th Cir.1995).

The opinion for the court disputes the connection between evidence of the existing extent of corn farming in Minnesota, near the areas that Ms. Jensen uses, and the likelihood that an expansion of corn production would also take place near those same areas. Similarly, the court would deny any connection between evidence of the existing prevalence of atrazine in the drinking water in Minneapolis and the likelihood that an expansion of corn production would increase those atrazine levels. Yet the Supreme Court has stated that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). Indeed, it should go without saying that appellants "need not be omniscient and pinpoint precisely where the next infraction will occur." *International Union of Bricklayers & Allied Craftsmen v. Meese,* 761 F.2d 798, 803 (D.C.Cir.1985). In a NEPA case, where the asserted interest is inherently probabilistic in nature, the plaintiff need show only that the heightened risk to her interest is not conjectural or hypothetical. *See Idaho Conservation League,* 956 F.2d at 1516.

By concluding that Ms. Jensen has failed to demonstrate a geographic nexus to the risk of serious environmental harm, the court erroneously requires her to demonstrate certainty of injury to her concrete interest in the wildlife areas that she uses and in the water that she drinks. The court is in agreement that, because of the diffuse impact of a rulemaking such as the ETBE tax credit, a prospective plaintiff suffers a particularized injury only if she can show that a localized impact is more likely where she lives than simply anywhere in the country. *See* Maj. Op. at 667; *cf. Lujan v. Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7 (stating that "persons who live (and pro-

pose to live) at the other end of the country from the dam" "have no concrete interests affected")). But Ms. Jensen's affidavit, taken together with appellants' expert testimony, establishes a greater likelihood of a localized impact where Ms. Jensen lives. If appellants' showing is insufficient, as the court concludes, then it is difficult to imagine who would be able to satisfy the injury-in-fact element of standing in a procedural-rights case involving a nationwide rulemaking.[9] The standing doctrine, designed to respond to concerns about the separation of powers and avoiding advisory opinions, *see Lujan v. Defenders of Wildlife,* 504 U.S. at 559–60, 112 S.Ct. at 2135–36, does not lead to such an incongruous result.

### C.

**Causation.** The court holds, in the alternative, that the increased likelihood of harm to the plaintiffs' concrete interests is not fairly traceable to the ETBE tax credit. Maj. Op. at 669–670. According to the court, the plaintiffs' "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." Maj. Op. at 671.

In deciding whether harm caused directly by the actions of a third party are fairly traceable to the defendant, courts must assess the incentives that the defendant's conduct provided to the third party. "While the personal injury inquiry focuses on concrete facts about harm to the plaintiff, causation questions concern the directness of the link between the defendant's challenged action and the alleged injury, and focus on the incentive structure to which the intervening third party, who directly causes the injury, is responding." *Griles,* 824 F.2d at 17; *see also Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 669 (D.C.Cir.1987). There is no *per se* rule that intervening acts by a third party breaks the chain of causa-

---

9. Inexplicably, the court notes that *Lujan v. Defenders of Wildlife* suggests that homeowners upstream from a dam would have standing in a NEPA case, Maj. Op. at 666, but holds that Ms.

Jensen, who drinks the affected water, does not. Surely the pollution of one's drinking water is a concrete and particularized injury. *See* Maj. Op. at 667 n.4.

tion. "'[M]ere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice.'" *Telephone & Data Sys., Inc. v. FCC*, 19 F.3d 42, 47 (D.C.Cir.1994) (quoting *National Wildlife Fed'n v. Hodel*, 839 F.2d 694, 705 (D.C.Cir.1988)); *see also Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir.1992). In addition, "'[w]e are concerned here not with the length of the chain of causation, but [with] the plausibility of the links that comprise the chain.'" *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C.Cir.1984) (quoting *Public Citizen v. Lockheed Aircraft Corp.*, 565 F.2d 708, 717 n. 31 (D.C.Cir.1977)).

The Secretary maintains that a complex and improbable sequence of events must ensue in order for the ETBE tax credit to affect appellants' concrete interest: namely, that the ETBE tax credit must prompt ETBE production, which must increase demand for ethanol, which must increase demand for corn, which must increase corn farming, which must cause environmental harm. With only one exception, however, the Secretary has failed to dispute appellants' proffered evidence establishing the likelihood of each of these causal links and the connections between them. The Secretary does not dispute record evidence that increased corn farming would adversely affect the environment by, among other things, increasing erosion and water pollution as farmers plant crops on now idle or underused land and expand their use of pesticides and fertilizers. It is also undisputed that an in-

creased demand for ethanol would increase domestic corn production. Appellants presented a study by Professor Peter Berck, an agricultural and resource economist at the University of California at Berkeley, who estimated that, as a result of the tax credit, the acreage of farm land devoted to growing corn would increase by between 281,000 acres to 14 million acres, depending on which of several projections regarding increased demand for ethanol proves to be correct.[10] Insofar as estimates regarding increased ethanol production prove correct, the Secretary does not dispute Professor Berck's conclusions.[11]

As a result, the question whether appellants have established the causation element of standing depends solely on the likelihood that the ETBE tax credit will stimulate demand for ethanol. According to data released by the Department of Energy in May 1995, production of ETBE as of January 1, 1995, was 3,980 barrels per day, located at three plants in Virginia, Illinois and Minnesota.[12] 1 Energy Info. Admin., Petroleum Supply Annual 1994, at 125 tbl. 52 (May 1995). Although the court emphasizes that this level of production remains relatively low, Maj. Op. at 671, the increase in ETBE production from zero when the tax credit was adopted in 1990 to 3,980 barrels per day by the end of 1994 tends to support appellants' claim that the tax credit is likely to stimulate demand for ethanol. The tax credit of 60 cents per gallon of ethanol amounts to a credit of 25 cents per gallon of ETBE,[13] which reduces

---

10. The low-end estimate for increased crop acreage is derived from estimates by corn industry groups in letters to the Secretary of Treasury and testimony at a House Ways and Means Committee hearing that corn production would increase by about 100 million bushels and is based on a low estimate of the elasticity of the supply of corn.

11. The Secretary presented a report by Professor Leo Polopolus and Professor Andrew Schmitz that "review[ed] the allegations of this lawsuit concerning sugar crops" but did not address Professor Berck's conclusions concerning corn crops.

12. Other sources indicate that ETBE production continues to increase. According to 21st Century Fuels, ETBE production capacity increased

from 35,000 barrels a day in late 1994 to 66,100 barrels a day in late 1995—a growth ascribed to tax credits for ETBE. *ETBE Capacity Grows, Carb Fuel Offers New Blending Prospects*, 21st Century Fuels, vol. 15, no. 12 (Dec. 1, 1995). In addition, uncertainty about the tax credit's continued viability—stemming in part from this litigation, commenced very shortly after the Secretary's announcement of the final rule, Maj. Op. at 661—may explain the ethanol industry's decision to delay investment in ETBE production. *Cf. Lawsuit Challenging Credit Still Alive; ETBE Credit Hangs in Balance as Congress Fails to Clarify Issue in Budget Bill*, 11 Alcohol Week's New Fuels Report No. 44, at 1 (Nov. 5, 1990).

13. The compound ETBE consists of about 42% ethanol.

the cost of production of ETBE, according to Secretary Yeutter's 1989 estimate, from about 95 cents a gallon to around 70 cents a gallon. Letter from Clayton Yeutter, Secretary of Agriculture, to J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate, attachment at 5 (Nov. 2, 1989). Moreover, this is not a case where a plaintiff has seized on a possible incidental side-effect of a government action; rather, increasing demand for ethanol was one of the Secretary's stated purposes in proposing extension of the tax credit to ETBE. *See* Alcohol Fuels Credit; Definition of Mixture, 54 Fed.Reg. 48,639, 48,640 (Nov. 24, 1989). The record is replete with evidence that proponents of the ETBE tax credit expected the tax credit to increase demand for ethanol and corn production.[14] The Secretary's own experts, Professor Leo Polopolus and Professor Andrew Schmitz, indicated that the "development and growth of the corn based U.S. ethanol industry is due to the various federal and state tax incentives, subsidies, and loan guarantees." Indeed, unless we assume that the Secretary promulgated the ETBE tax credit as nothing more than an empty gesture, it is difficult to understand his argument that an effective reduction in the price of production from 95 cents to 70 cents a gallon will have no impact on ETBE production.[15] In light of appellants' evidence of a substantial effect from the tax credit, it is more than "somewhat curious" for the Secretary to "minimiz[e] the importance and impact of his own decision[ ]" in order to defeat standing. *Securities Indus. Ass'n v. Clarke*, 885 F.2d 1034, 1041 (2d Cir.1989), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1021 (1990).

The court relies on the analyses of causation in the Supreme Court's decisions in *Allen v. Wright* and *Simon v. Eastern Kentucky Welfare Rights Organization. See* Maj. Op. at 670–671. The Supreme Court has explained, however, that both those decisions were motivated by separation-of-powers concerns that "counsel[ ] against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a restructuring of the apparatus established by the Executive Branch to fulfill its legal duties." *Allen v. Wright*, 468 U.S. at 761, 104 S.Ct. at 3329–30; *see also* Cass R. Sunstein, *Standing and the Privatization of Public Law*, 88 Colum. L.Rev. 1432, 1451–61 (1988). By contrast, appellants challenge not the ETBE tax credit,[16] but rather the Secre-

---

**14.** *See* Letter from Clayton Yeutter, Secretary of Agriculture, to Nicholas F. Brady, Secretary of the Treasury (Mar. 20, 1989) ("ETBE, with the blender tax credit, will enable the domestic ethanol industry to expand and provide a growing market for U.S. feed grains."); Letter from Clayton Yeutter, Secretary of Agriculture, to J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate (Nov. 3, 1989); Letter from Alan Kemper, President, National Corn Growers Ass'n, to Commissioner of the Internal Revenue Service (Dec. 8, 1989) ("Every six gallons of ETBE produced will consume approximately one bushel of corn. As you can see, in an expanded ETBE market, the potential for the utilization of one of American's greatest renewable resources (corn) would be significant."); Letter from Criss Davis, President, Wisconsin Corn Growers Ass'n, to Commissioner of the Internal Revenue Service (Dec. 20, 1989); Outline of Comments on Tax Credits for ETBE, Frederick C. Spreyer, State of Hawaii, Dep't of Business and Economic Development; Letter of Daryl Reid, President, Illinois Corn Growers Ass'n, to Commissioner of the Internal Revenue Service (Dec. 12, 1989); *see also Market Hinges on Favorable Treasury Dep't Ruling*, Alcohol Week 6–7 (Oct. 24, 1988).

**15.** Although the court is correct that we "do not defer to the views of the IRS ... in determining whether a particular rule will cause injury to a particular plaintiff or as proof of any causal chain necessary for standing," Maj. Op. at 670–671, the statements by the Secretary of the Treasury and the Secretary of Agriculture simply support the common-sense inference that the tax credit is likely to lead to an increase in the production of ETBE. For standing purposes, contrary to the court's dictum, the court may consider congressional definitions of injury or congressional articulations of chains of causation. *See Lujan v. Defenders of Wildlife*, 504 U.S. at 578, 112 S.Ct. at 2145–46 (stating that Congress can "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law"); *id.* at 580, 112 S.Ct. at 2146–47 (Kennedy, J., concurring in part and concurring in the judgment).

**16.** In *Allen v. Wright*, the plaintiffs alleged that the conduct of the Internal Revenue Service (IRS) violated the Internal Revenue Code, civil rights laws, and the Constitution, 468 U.S. at 745 n. 12, 104 S.Ct. at 3321 n. 12; in *Simon*, the plaintiffs alleged that the conduct of the IRS violated the Internal Revenue Code and the APA, 426 U.S. at 33–34, 96 S.Ct. at 1921–22.

tary's failure to prepare an EIS. The Supreme Court has been far more generous in its causation analysis outside the context of constitutional challenges to a third party's tax liability. In a NEPA standing case, *United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (*SCRAP*), the Supreme Court allowed standing despite what the opinion for the court acknowledges, Maj. Op. at 671–672, is a similarly indirect chain of causation.[17] *See Defenders of Wildlife v. Hodel,* 851 F.2d 1035, 1043 (8th Cir. 1988) (distinguishing *Allen v. Wright* on the ground that it was a "constitutional challenge, whereas this case involves, as did *SCRAP,* questions of statutory interpretation"); *see also* Fletcher, *supra,* at 258–60 (explaining *SCRAP* as a NEPA case). To take another example, in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 75–77, 98 S.Ct. 2620, 2631–33, 57 L.Ed.2d 595 (1978), in which the plaintiffs challenged a federal statutory limitation on liability for nuclear accidents, the defendants denied that there was causation by asserting that the nuclear power plants near which the plaintiffs lived might have been constructed and operated even without the federal statute. The Supreme Court upheld the district court's conclusion that, based on congressional testimony by corporate officials and expert testimony presented by the plaintiffs, there was a "substantial likelihood" that the power plants would not have been constructed and operated if it were not for the federal statute. The statements by Cabinet officials about the purposes of the ETBE tax credit and appellants' expert testimony similarly establish a substantial likelihood that the tax credit will increase the risk of serious environmental harm.

The separation-of-powers concerns that underlay *Allen v. Wright* and *Simon v. Eastern Kentucky Welfare Rights Organization* do not apply to appellants' NEPA claim. The causation element of standing, as employed by the Supreme Court, is "something of a term of art, taking into account not merely an estimate of effects but also considerations related to the constitutional separation of powers as that concept defines the proper role of courts in the American governmental structure." *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 801 (D.C.Cir.1987) (opinion of Bork, J.). Appellants' NEPA claim, however, asks the court to enforce a procedural right of the sort that courts are accustomed to adjudicating and are well-equipped to handle. Vindication of appellants' procedural right would entail no judicial intrusion into the workings of the executive branch, as might have occurred in *Allen* and *Simon.* Moreover, the separation-of-powers concerns in the standing inquiry are different when a plaintiff seeks to enforce a statutory, rather than a constitutional, right. Although the court maintains that hearing this lawsuit would set us up as "a back-seat Congress," Maj. Op. at 672, the court, by denying standing, effectively second-guesses Congress' determination to create an inherently predictive right in NEPA.

The opinion for the court principally identifies two links in the chain of causation that it concludes are too weak to sustain standing. First, fuel producers may decide to increase production of ETBE for reasons independent of the challenged tax credit. Second, even if the tax credit causes production of ETBE and ethanol to increase, the resulting marginal effect on corn production may be dwarfed by other causal factors (such as weather) that either increase or reduce the production of corn.[18] *See* Maj. Op. at 670.

17. Although *SCRAP* has been limited, *see Lujan v. National Wildlife Federation,* 497 U.S. at 889, 110 S.Ct. at 3189, it remains binding law in the NEPA context. Because we consider the evidence the plaintiffs have submitted in this case sufficient to warrant summary judgment in their favor on the standing issue, the distinction noted by the court—that *SCRAP* was decided on its pleadings—does not reduce that case's support for our conclusion that the plaintiffs in this case have demonstrated standing.

18. The other links in the chain of causation need not be treated separately. *See* Maj. Op. at 669–670. An increase in the production of ETBE necessarily leads to an increase in the demand for ethanol (which comprises 42% of the ETBE compound). Such an increase in the demand for ethanol is highly likely to lead to an increase in the production of ethanol, which necessarily leads to an increase in the demand for the constituent agricultural products (corn or sugar) used in the production of ethanol. In turn, it is highly likely that an increase in the demand for

The question whether the fuel producers' decisions to increase the production of ETBE are fairly traceable to the ETBE tax credit depends on the importance of the tax credit in their decision. The record shows that fuel producers already have substantial ETBE production capacity, *see ETBE: Ethanol's Motor Fuel Hope?*, Chemical Business 38, 38 (Oct.1988) (stating that methyl tertiary butyl ether production facilities can be converted to produce ETBE), so that the decision at the margin whether to produce more ETBE turns on its profitability. If the ETBE tax credit were insufficient to stimulate production of ETBE because the production of any ETBE remained unprofitable, then the plaintiffs' case for causation would fail. But the plaintiffs have provided evidence that ETBE is in fact now being produced and that the tax credit was designed to be large enough to stimulate production. *See supra* Parts II A & B. In *City of Los Angeles*, Judge D.H. Ginsburg would have denied standing because the plaintiffs "ma[de] no allegations ... concerning the incremental harm wrought by the agency's decision." 912 F.2d at 484 (D.H. Ginsburg, J., dissenting in part). By contrast, in the instant case it is precisely the injury caused by the marginal increase in the production of ethanol on which the plaintiffs rely.[19]

The court rejects much of the plaintiffs' evidence as "speculation," relying on *United Transportation Union v. ICC*, 891 F.2d 908, 912 (D.C.Cir.1989), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990), in which the court stated that, "[w]hen considering any chain of allegations for standing purposes, we may reject as overly speculative

those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions—those types of allegations that are not normally susceptible of labelling as 'true' or 'false.'" *See* Maj. Op. at 667–668, 670. Yet the *United Transportation Union* court noted also that "application[s] of basic economic logic" are not "speculative": "Allegations founded on economic principles ...,· while perhaps not as reliable as allegations based on the laws of physics, are at least more akin to demonstrable facts than are predictions based only on speculation." 891 F.2d at 912 n. 7; *see also Adams v. Watson*, 10 F.3d 915, 923 (1st Cir.1993) (noting that economic predictions are routinely used in standing cases). For example, the proposition that the supply of a commodity (here, ETBE) will increase if the government subsidizes the cost of its production is uncontroversial. *See* PAUL A. SAMUELSON & WILLIAM D. NORDHAUS, ECONOMICS 64 (12th ed.1985). Similarly, the proposition that an increase in the demand for a certain commodity (here, corn) will normally cause the ·price for that commodity to rise, which will in turn cause the quantity of the commodity supplied to increase until supply again equals demand, is commonly accepted and certainly not "speculative." *Id.* at 67. Although the magnitude of the price effects may vary by commodity (depending on the elasticity of demand and of supply, *see id.* at 379–84), courts may assume for purposes of standing, unless a contrary reason is shown, that a defendant's actions will have the effect that economics would foretell.[20] We need not

corn or sugar will lead to an increase in the production of corn or sugar. Finally, it is highly likely that much of the increased production of corn or sugar will occur on previously unused lands instead of displacing prior agricultural production of another kind.

**19.** Even if the aggregate increase in corn farming is not significant, given the total acreage devoted to corn farming in the United States, the devotion of now idle or underused land to corn farming can dramatically affect the particular environments where it occurs. The resultant harm can include "effects on surface and ground water from changes in water run-off patterns, soil erosion, wildlife effects, and effects on forests if more land is cleared for crop production."

Environmental Protection Agency, Analysis of the Economic and Environmental Effects of Ethanol as an Automotive Fuel, at iv (Apr.1990). It is that localized incremental impact that appellants directly challenge.

**20.** For example, in *Branton v. FCC*, 993 F.2d 906 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1610, 128 L.Ed.2d 338 (1994), the court held that a plaintiff challenging the Federal Communication Commission's failure to levy a fine against a licensee for broadcasting indecent language lacked standing because it was speculative whether the imposition of a fine would redress the plaintiff's injury. The court denied that its opinion was "inconsistent with the fundamental

shut our eyes from the reality, as predicted by the two other branches of government as well as the affected industry, that the ETBE tax credit will likely increase the production of ETBE, which in turn will likely increase the production of corn.

The second weak link, in the court's view, is the relation between a marginal increase in the production of corn fairly traceable to the ETBE tax credit and an overall increase in fact that is not confounded by independent causal factors. Although it is certainly conceivable that a change in weather patterns or a restriction of credit available to farmers could result in a net decrease in the production of corn, it is sufficient for standing purposes that the marginal impact from the tax credit increases the risk of environmental injury to the plaintiffs. Even if in a given year the increase fairly traceable to the ETBE tax credit is dwarfed by other factors, the production of corn in that year is still highly likely to be higher than it would have been without the ETBE tax credit—or at least higher over a period of several years than it would have been without the tax credit. This incremental impact satisfies the causation element of the standing inquiry. As the Supreme Court has observed, "[n]othing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested." *Duke Power,* 438 U.S. at 78, 98 S.Ct. at 2633.

### D.

**Redressability.** The nature of the plaintiffs' NEPA injury demonstrates its redressability. The plaintiffs have met their burden to show that the procedural injury they claim—the risk that serious environmental harms were overlooked in promulgating the ETBE tax credit—will be redressed by having the court order the Secretary to prepare an EIS. As the opinion for the court agrees, Maj. Op. at 663, the plaintiffs need not establish that, in response to a court order to prepare an EIS, the Secretary would rescind

or modify the ETBE tax credit and thereby alleviate the threatened injury to their concrete interest. *See Lujan v. Defenders of Wildlife,* 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7; *Idaho Conservation League,* 956 F.2d at 1517; *City of Los Angeles,* 912 F.2d at 499.

### E.

**Zone of interests.** In enacting NEPA, Congress declared that, in view of

the profound impact of man's activity on the interrelations of all components of the natural environment ... [and] the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, ... it is the continuing policy of the Federal Government ... to use all practicable means and measures ... in a manner calculated to foster and promote the general welfare....

NEPA § 101(a), 42 U.S.C. § 4331(a). To carry out this policy, Congress "direct[ed] that, to the fullest extent possible, ... all agencies of the Federal Government shall ... include in every ... major Federal action[ ] significantly affecting the quality of human environment, a detailed [environmental impact statement]." *Id.* § 102(2)(C), 42 U.S.C. § 4332(2)(C). The environmental harms stemming from increased corn farming suggested by appellants' proffers, and no less by Ms. Jensen's sworn declaration, fall within NEPA's zone of interests. *See City of Los Angeles,* 912 F.2d at 495.

Accordingly, because Ms. Jensen has adequately demonstrated all the elements for standing, I would reverse the grant of summary judgment to the Secretary on standing, and remand the case to the district court to enter summary judgment for appellants on standing and to address the remaining issues.

principle that increasing the price of an activity ... will decrease the quantity of that activity demanded in the market" because the court concluded that there was a low "elasticity of demand for broadcast indecency." *Id.* at 911–12 (ex-

plaining that non-profit broadcast journalists often ignore monetary incentives). By contrast, appellants have presented uncontroverted expert testimony from Professor Berck as to the demand and supply elasticities for corn.