**NATIONAL PARK AND CONSERVA-TION ASS'N, et al., Plaintiffs,**

v.

**Robert STANTON, Director, Nat'l Park Serv., et al., Defendants.**

Civil Action No. 98–615(GK).

United States District Court,
District of Columbia.

June 14, 1999.

This matter is now before the Court on the parties' cross-motions for summary judgment. Upon consideration of the motions, oppositions, replies, and the entire record herein, for the reasons discussed below, Plaintiffs' Motion for Summary Judgment [# 18] is **granted,** and Defendants' Motion for Summary Judgment [# 19] is **denied.**

## I. Background[1]

The Niobrara, a unique river with abundant resources that runs through north-central Nebraska, is known for its historical, paleontological, archaeological, and ecological treasures. 137 Cong.Rec. H2299 (daily ed. May 14, 1991) (statement of Representative Hoagland). Its forests abound with ponderosa pine, American elm, but oak, green ash, basswood, hackberry, and black walnut trees. A.R. at 1028–29. There is striking bio-diversity among the vegetation, where 160 plant species from eastern, western, and northern forest ecosystems intermingle along the River valley. A.R. at 1028. The Niobrara provides shelter and homes for bald eagles, turkeys, grouse, quails, doves, pheasants, ducks, and geese. A.R. at 1030. It is also home to several threatened and endangered species, including the peregrine falcon, the interior least tern, the piping plover, and the whooping crane. *Id.* Palaeontologists find a wealth of artifacts on the fossil beds along the Niobrara, including deposits from eighty species of extinct vertebrates. A.R. at 1028. In one fossil excavation site, at least 146 vertebrate species were found. *Id.* of the 164 cataloged fossil excavation sites, 15 were rated as internationally significant, and 37 were rated nationally significant. *Id.* The River was named one of the 10

David Allen Kikel, Hogan & Hartson, L.L.P., Washington, DC, for plaintiffs.

Heidi Kukis, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Anthony P. Hoang, Geoffrey Garver, U.S. Dept. of Justice, Environment & natural Resources Division, Washington, DC, for defendants.

### *MEMORANDUM OPINION*

KESSLER, District Judge.

Plaintiffs National Parks and Conservation Association ("NPCA"), Barry Harper, and the American Canoe Association ("ACA") bring this suit against Robert Stanton, Director of the National Park Service ("NPS"), and Bruce Babbitt, Secretary of the Department of the Interior ("Secretary"), challenging Defendants' plan for management of the Niobrara National Scenic River ("Niobrara"), located in Nebraska. The challenged management plan, under which NPS delegates all its responsibilities for managing the Niobrara to an independent local council over which NPS has virtually no control, is the first of its kind. Plaintiffs also challenge the adequacy of the Environmental Impact Statement created by Defendants pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").

---

1. Pursuant to Local Rule 108(h), "[i]n determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The Court thus takes these facts from the parties' Statements of Material Facts Not in Dispute. Furthermore, since this case is a review of an administrative agency's decision, the Court also relies on facts contained in the Administrative Record ("A.R.").

best canoeing rivers in the nation by Backpacker magazine, and one of the eight special camping areas in the nation by Outside magazine. 137 Cong.Rec. H2299 (daily ed. May 14, 1991) (statement of Representative Hoagland).

One of the Niobrara's unique features is that it runs largely through private land. In 1991, Congress, despite local opposition, designated portions of the Niobrara to become components in the pre-existing national Wild and Scenic Rivers system. Niobrara Scenic River Designation Act of 1991, Pub.L. 102–50, 105 Stat. 254 (1991) ("NSRDA"); 16 U.S.C. § 1274(a)(117). Recognizing that the area along the River was largely privately-held, Congress limited the amount of land the federal government could acquire, and encouraged state and local involvement in the administration and management of the River locale. NSRDA, 105 Stat. at 255. Congress also created the eleven member Niobrara Scenic River Advisory Commission ("Advisory Commission"), an advisory group representing local interests, for the purpose of aiding NPS in developing a management plan for the area. *Id.*

As the agency responsible for overseeing the administration of the Niobrara, NPS developed, with the help of the Advisory Commission, a General Management Plan and Environmental Impact Statement ("GMP/EIS"). The GMP/EIS outlined four management alternatives for administering the Niobrara: Alternative A, which called for no action, was the baseline against which to compare the other plans; Alternative B provided for management by a local council, which would include members from various county and state agencies, as well as local landowners and business people; Alternative C provided for partnership management between NPS and local entities, where any necessary services needed in managing the River would be provided by local entities; and Alternative D provided for NPS management with involvement of local entities. In its EIS, NPS considered Alternatives B, C,

and D together, without evaluating possible environmental impacts that might occur under one alternative but not others. NPS explained that it created the EIS in this manner because it did not believe the impacts of the three alternatives would be different, since they shared a common goal.

NPS chose Alternative B as the preferred strategy for managing the Niobrara, and that decision was memorialized in the Record of Decision ("ROD"), as was the general management plan and final EIS for the Niobrara. In July of 1997, NPS entered into the Interlocal Cooperative Agreement ("Interlocal Agreement") with local Nebraska governmental entities. The Interlocal Agreement established the Niobrara Council ("Council"), and outlined the Council's duties, which included: enter into agreements with NPS or the U.S. Fish and Wildlife Service ("FWS"); obtain and use funds from any source to perform its functions; coordinate management of the Niobrara with the responsible agencies; assist the four cooperating counties in developing zoning and other land protection methods; review county zoning ordinances and actions for consistency with the GMP; provide a forum for landowner/government conflict; work with landowners and provide technical assistance where there is no zoning; manage law enforcement, public access sites, visitor use levels, and other operational functions; retain the services of professionals as necessary to perform its duties; retain staff members to perform its functions; and acquire and manage real and personal property for staff office purposes only. Interlocal Agreement, at ¶ 5. The Interlocal Agreement also noted that the Council should attempt to find outside sources of money, to avoid having NPS "dictate the decisions of the council." *Id.*

The Council may only be dissolved by act of the four cooperating counties, or by termination of the Interlocal Agreement by NPS. By–Laws of Niobrara Council, art. IV, ¶ 1 ("By–Laws"). Any of the four

counties may withdraw from the Interlocal Agreement upon 60 days' notice, but the withdrawal of any county does not terminate the agreement. Interlocal Agreement, at ¶ 11.

The Council consists of fifteen members: four county commissioners (one from each participating county); four landowners (one from each participating county) two representatives of local Natural Resource Districts; one timber industry representative; one recreational business representative; one representative of the Nebraska Game and Parks Commission; one FWS representative; and one NPS representative. By–Laws, art. I, ¶ 4. Decisions are reached through simple majority vote. *Id.* at art. I, ¶ 10(k)(1).

On August 6, 1997, the Council entered into a Cooperative Agreement with NPS, as called for in the ROD. The Cooperative Agreement can be terminated by either party upon sixty days' notice, and can be modified by mutual written agreement. By–Laws, art. VII, ¶ A. If the Council fails to manage and protect the Niobrara as set forth in the GMP/EIS, NPS has the authority to terminate the Agreement and implement one of the other Alternatives for managing the Niobrara. Under the GMP/EIS, the Council must carry out its activities to meet standards acceptable to NPS. A.R. at 965–1175. Under the Cooperative Agreement, NPS must "consider for consistency with the GMP the advice and recommendations of the Council during and upon completion of its activities identified above." Cooperative Agreement, Art. II.B.

Plaintiffs allege that although it has been over one and a half years since the Council was established, nothing has been done to protect or manage the Niobrara's resources. Plaintiffs challenge the decision to adopt Alternative B, the duties that have been delegated to the Council, and NPS' compliance with NEPA. Plaintiffs seek an injunction requiring NPS to administer the Niobrara itself, and requiring NPS to complete a more thorough EIS under NEPA.

## II. Standard of Review

All parties recognize that the Court is bound by a highly deferential standard of review for agency action. Under the Administrative Procedure Act ("APA"), an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In exercising its narrowly defined duty under the APA, the Court must consider whether the agency acted within the scope of its legal authority, adequately explained its decision, based its decision on facts in the record, and considered the relevant factors. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

## III. Analysis

The three issues presented in this case are whether Plaintiffs have standing to bring either of their claims, whether NPS has unlawfully delegated its responsibilities to the Council, and whether NPS' EIS is insufficient and therefore violative of NEPA.[2]

2. Preliminarily, there is a procedural issue that must be addressed. Plaintiffs present evidence that is not found in the Administrative Record, and in some cases did not materialize until after NPS made its final decision in this case. Neither party disputes that such evidence can be considered for the standing and NEPA issues, and both parties agree that the Interlocal Agreement, the Cooperative Agreement, and the Council's By–Laws should be considered in deciding the unlawful delegation claim. Defendants argue, however, that Plaintiffs wrongfully rely on additional extra-record and post-decisional evidence in their arguments on the unlawful delegation claim. Because this claim is brought under the APA, the Court can only consider evidence that is included in the Administrative Record, and will thus not take into account the additional evidence provided by Plaintiffs on the

## A. Justiciability

Defendants argue that Plaintiffs do not have standing to bring either of their claims, and that neither claim is ripe.

### 1. Standing

To prove standing, Plaintiffs must show: (1) they have suffered a concrete, personal, and particularized "injury in fact" to a legally protected interest; (2) a causal connection between the injury and the action of the defendant, fairly traceable to the challenged action; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In making this showing, Plaintiffs cannot rest on mere conclusory allegations but must set forth specific facts, either through affidavits or other evidence which, for standing purposes, will be accepted as true. *Id.* at 561, 112 S.Ct. 2130. Furthermore, for the purposes of standing, Plaintiffs' legal theory of the case must be accepted as valid. *Animal Legal Defense Fund v. Glickman*, 154 F.3d 426, 441 (1998) (en banc) [herein *ALDF*].

#### a. Unlawful Delegation Claim

Plaintiffs argue that they have suffered personal and particularized injury from NPS' decision to delegate its responsibilities to the Council. First, relying on *ALDF*, Plaintiffs correctly point out that injury to aesthetic interests satisfies the first prong of the *Lujan* test. As the court found in *ALDF*, "the Supreme Court and [the District of Columbia] circuit have frequently recognized the injury in fact of plaintiffs who suffered aesthetic injury stemming from the condition and quality, or despoliation, of an environmental area that they used." *ALDF*, 154 F.3d at 434. In support of their theory, Plaintiffs argue that they have suffered injuries to their aesthetic, environmental, and recreational interests, because NPS' delegation of its

duties to the Council resulted in the following serious conditions: failure to control overcrowding, failure to remove pit toilets which pollute the River, failure to screen a junk yard, failure to properly manage campsites, failure to protect delicate flora and prevent the spread of noxious weeds, failure to control erosion; failure to control development close to the River, failure to manage garbage and waste removal, and failure to control unruly crowds.

Plaintiffs are frequent visitors to the River, who seek solitude and aesthetic enjoyment of the Niobrara's resources, and all plan to visit the River again in the near future. NPCA member Susan Lawler, who regularly visits the River to canoe, observe wildlife, photograph the River, birdwatch, hike, and picnic, has stopped her weekend visits due to overcrowding and unruly visitors who are disruptive and noisy, and who throw bottles and cans in the River between canoes. Aff. of Lawler, at 1–2.

ACA member Keith Hentzen is an avid canoeist who enjoys the peace, solitude, and aesthetic beauty of his canoe trips on the Niobrara, which he visits at least once a year. Aff. of Hentzen at 1. Mr. Hentzen has suffered aesthetic injuries stemming from the creation of unofficial canoe access points along the River, as well as the encroaching development which diminishes the aesthetic and spiritual enjoyment of his canoe trips. *Id.* at 3.

Thomas Tiffany Varney, a member of ACA and an avid cancer and kayaker who makes annual trips to the Niobrara, has been injured by encroaching development due to the lack of zoning in one of the counties through which the Niobrara runs, as well as the failure to control overcrowding and unruly visitors. Decl. of Varney at 1–2.

Barry Harper, member of NPCA, takes regular trips to the Niobrara with his fam-

---

unlawful delegation claim. Furthermore, as will be discussed *infra*, no additional evidence outside the Administrative Record is needed to decide whether NPS has unlawfully delegated its responsibilities.

ily. Aff. of Harper at 1. He enjoys canoeing, observing wildlife, fishing, swimming, and birdwatching on the Niobrara. His aesthetic and spiritual enjoyment of the River has been impaired by the inability to find solitude due to overcrowding, the creation of unattractive and unofficial canoe access points, the littering and damage to vegetation caused by inconsiderate visitors, and the failure to screen unsightly buildings and concessions shacks. *Id.* at 2–5.

■ Second, Plaintiffs also claim "informational" injuries. They argue that since the Council is not a federal entity, any decisions it makes are not subject to the rigorous requirements of the APA. Specifically, the Council's decisions need not be publicly announced, are not subject to notice-and-comment, and need not be published in the Federal Register, all of which the APA demands. 5 U.S.C. §§ 552(a), 553. Plaintiffs argue that they have thus been deprived of a single, nationally-accessible source of information about rulemaking activities affecting the Niobrara. Such "informational injuries" have been recognized as sufficient for establishing "injury in fact". *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,* 789 F.2d 931, 937 (D.C.Cir.1986).

It is clear from Plaintiffs' declarations that they have suffered the personal and particularized injuries required under the first prong of the *Lujan* test; the next step is determining whether those injuries are traceable to Defendants' actions. Plaintiffs allege that their injuries can be traced to the fact that the Council has done virtually nothing to protect the River since its inception over a year and a half ago, whereas NPS would have taken some remedial action during this time which would have alleviated Plaintiffs' injuries. Plaintiffs note that in his deposition, Paul Hedren, Superintendent of the Niobrara National Scenic River, admitted that other than engaging in some discussions at Council meetings, the Council itself has failed to take any of the following actions:

protect archeological and historical sites as well as cultural landscapes, monitor water quality, control erosion of delicate sand cliffs and other areas along the River, safeguard wildlife, protect fossil excavation sites, inventory natural resources, manage exotic species of vegetation, control noxious vegetation, police the River, rescue capsized cancers, control river access problems and unofficial canoe launch points, stabilize river banks, monitor visitor usage, repair forests, construct handicap-accessible facilities, prevent groundwater contamination by pit toilets, screen buildings and other unsightly structures, purchase easements, and encourage local counties to adopt zoning laws that would protect the River.

In *ALDF,* where the plaintiffs proceeded under a strikingly similar theory, our Court of Appeals, sitting en banc, held that "Supreme Court precedent establishes that the causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries, if that conduct would allegedly be illegal otherwise." *ALDF,* 154 F.3d at 440.

In *ALDF,* the plaintiff alleged that his aesthetic injuries (observing animals living under inhumane conditions) were caused by the United States Department of Agriculture, which misinterpreted the statute to permit a third party to establish conditions for the animals which the plaintiff alleged were inhumane. The Court of Appeals held that the plaintiff satisfied the causation prong of the *Lujan* test, because the "proper comparison for determining causation is not between what the agency did and the status quo before the agency acted. Rather, the proper comparison is between what the agency did and what the plaintiffs allege the agency should have done under the statute." *ALDF,* 154 F.3d at 441. The Court went even further to hold that

‘[the plaintiff] need not prove that the agency action it attacks is unlawful . . .

in order to have standing to level that attack.' ... Both the Supreme Court and this circuit have repeatedly found causation where a challenged government action permitted the third party conduct that allegedly caused a plaintiff injury, when that conduct would have otherwise been illegal. Neither court has ever stated that the challenged law must compel the third party to act in the allegedly injurious way.' *Id.* at 441–42 [internal citations omitted].

■ In this case, as in *ALDF*, Plaintiffs allege that the agency's action (NPS' unlawful delegation of its responsibilities to the Council) authorized the conduct (Council's inaction) that caused their injuries, and that that conduct (inaction for over a year and a half) would have been illegal otherwise. Plaintiffs allege that if NPS had not delegated its responsibilities to the Council, it would have taken at least minimal steps during this time to protect the Niobrara.

In support of their argument, Plaintiffs submitted the affidavit of Eugene Koevenig, who for twenty-six years served as NPS' Chief of Maintenance at Mount Rushmore National Memorial. Koevenig stated in his affidavit that the Niobrara "is not receiving the minimum level of care and protection that the NPS provides for other units of the National Park System." Aff. of Koevenig at 3. Koevenig stated that by this point, if NPS were exercising its usual responsibilities, it normally would have initiated a carrying capacity study, considered options to limit access to the appropriate carrying capacity, taken steps to replace pit toilets with holding tanks or treatment facilities, posted signs along fragile sand cliffs warning visitors not to climb them, posted signs or barriers to prevent the destruction of sensitive flora, employed ditches, culverts, or surface roads around river access points to mini-

mize erosion, protected a historical cabin alongside the River (which is apparently so unprotected that even cows walk inside and around it), and provided firewood to campsites to prevent visitors from destroying trees and the habitats of small wildlife. Aff. of Koevenig at 3–5.

It is perfectly apparent that these minimal, low-budget actions could have been taken while a long-term management plan for the River was being created. In contrast, the Council, totally inexperienced in managing national resources like the Niobrara, has taken no steps to rectify any of Plaintiffs' injuries. Indeed, counsel for both parties acknowledged at oral argument that as of mid-February, 1999, a year and a half after its creation, the Council had yet to hire its first employee.

Defendants argue that it takes time to create a management plan for an area such as the Niobrara, and that NPS would not necessarily have accomplished more than the Council. However, even assuming that were true,[3] it does not mean NPS would not, in the exercise of its usual responsibilities, have implemented those minimal, low-budget projects discussed above that would minimize Plaintiffs' injuries and provide greater protection for this national treasure.

Defendants next argue that Koevenig's suggestion that NPS would have taken certain actions is mere speculation. Defendants contend that the lack of progress is not due to NPS' decision or the inaction of the Council, but to the fact that the local Niobrara/Missouri NPS field office is in its start-up phase, and Congress has not appropriated monies even though budget requests have been made.

Defendants, however, miss the point. The Court is required to accept Plaintiffs' legal theories of the case as valid for pur-

---

3. It is, however, difficult to believe that NPS, an agency delegated the responsibility for, and having experience with, managing wild and scenic rivers, would have done *nothing* in its start-up phase of over one and a half years, even with budgetary constraints and a local field office. The Court cannot accept an argument premised on abdication of NPS' statutory obligations.

poses of standing, so Defendants' protestations about the merit of these theories have no bearing on the finding of standing. Furthermore, as the Court of Appeals stated in *ALDF*, the proper comparison is between what NPS did and what Plaintiffs' allege NPS should have done. In this case, Plaintiffs allege that what NPS did was to unlawfully delegate its duties to the Council, when what it should have done was carry out its statutory duties to manage the Niobrara. Plaintiffs allege that it is this unlawful delegation which caused their injuries because the Council lacks NPS' experience in administering wild and scenic rivers and NPS has no way of ensuring that its statutory duties will be fulfilled.

NPS cannot defeat standing, and defend its failure to carry out statutory obligations, on the theory that it lacked sufficient appropriations, and that its field office was in the start-up phase. For purposes of establishing standing, Plaintiffs have shown that NPS' unlawful delegation caused their injuries, and have thus established the causation prong of the *Lujan* test.

■ The last prong of the standing test requires Plaintiffs to show a likelihood that the requested relief would alleviate their injuries during planned future visits. *ALDF*, 154 F.3d at 443. An injunction forbidding NPS from unlawfully delegating its responsibilities, and requiring it to fulfill its statutory obligation, would redress Plaintiffs' injuries, because NPS has the experience and expertise to manage the Niobrara, and would be able to implement short-term strategies while developing a long-term management plan. At the very least, NPS will do more than zero in administering the River, which is all that the Council has done so far. Furthermore, an injunction will clearly redress Plaintiffs' informational injuries, since NPS, unlike the Council, is subject to APA notice-and-comment and publishing requirements. An injunction would therefore also restore Plaintiffs' single, nationally-accessible source of information about rulemaking activities affecting the Niobrara.

Defendants argue that there is no guarantee that Plaintiffs' injuries would be redressed, because an injunction would likely delay the progress already made, and there is no guarantee that NPS, acting alone in the face of local opposition, would better protect and manage the Niobrara. Defendants further argue that Plaintiffs' informational injuries would not be redressed any differently with an injunction, since NPS remains responsible for complying with all federal laws.

The Court must assume, however, that NPS would carry out its statutory duties, and at a minimum redress those of Plaintiffs' injuries that are quickly and inexpensively remedied, such as: installing signs warning visitors not to climb the fragile sand cliffs or trample delicate flora, initiating a carrying capacity study, considering options to limit access to the appropriate carrying capacity, replacing pit toilets with holding tanks or treatment facilities, employing ditches, culverts, or surface roads around river access points to minimize erosion, protecting a historical cabin alongside the River by posting signs or fences, and providing firewood to campsites to prevent visitors from destroying trees and the habitats of small wildlife. Consequently, Plaintiffs have standing to bring their unlawful delegation claim.

### b. NEPA claim

Plaintiffs allege they have suffered injury because of an insufficient EIS completed by NPS, which did not adequately address environmental risks that would arise under Council management, as opposed to NPS management.

■ To demonstrate injury on a NEPA claim, Plaintiffs must show that the "insufficiency of an EIS may cause the agency to overlook the creation of a demonstrable risk not previously measurable (or the demonstrable increase of an existing risk) of serious environmental impacts

that imperil [plaintiffs'] particularized interest." *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 666 (D.C.Cir.1996). Plaintiffs have clearly made such a showing, since they have shown a "demonstrable increase of an existing risk" to their particularized interests: because of the Council's inaction in protecting the Niobrara, Plaintiffs' personal, aesthetic, and recreational interests in the enjoyment of the Niobrara have suffered to a much greater degree than they would have under NPS management of the Niobrara.

 To demonstrate causation on a NEPA claim, Plaintiffs must first connect the allegedly insufficient EIS to a government decision that may have been wrongfully decided because of that EIS, and must then connect that government decision to their particularized injuries. *Florida Audubon Soc'y v. Bentsen,* 94 F.3d at 668.

With respect to the first causation link, between an insufficient EIS and a government decision, Plaintiffs have demonstrated that if NPS had completed a thorough analysis of the environmental risks of a management by council plan, that alternative might not have been chosen. Defendants argue that because the GMP/EIS sets forth the same "desired future conditions" in the Niobrara area for Alternatives B, C, and D, it is speculative to say that a more thorough analysis would have found different environmental impacts from each of the Alternatives, leading to a different decision by NPS.

There are several flaws in Defendants' reasoning. First, the test for causation does not require Plaintiffs to show that the decision *would* have been different, only that it *may* have. *Florida Audubon Soc'y,* 94 F.3d at 668. Second, Defendants fail to understand that the mere fact that the goals are the same does not necessarily mean that the impacts are the same. For example, in the instant case, although Alternatives (C) and (D) calling for NPS management, and Alternative (B), calling for Council management, all may have the

same "desired future conditions", NPS' expertise in managing wild and scenic rivers would allow it to more efficiently and more speedily apply its management skills to managing the Niobrara than the inexperienced Council, which must first hire staff and learn the ropes before it can effectively do its job. Such inexperience and delay will necessarily have an environmental impact, as already illustrated in this case.

Plaintiffs have also established the second causation link, between the government decision and their injuries. As discussed above, Plaintiffs have demonstrated that the government decision (NPS' unlawful delegation of duties to the Council), caused their particularized injuries (aesthetic, recreational, environmental, and informational).

In addition to showing injury and causation, Plaintiffs have also shown redressibility. Since the injuries for NEPA violations are procedural, they are easily remedied by requiring the agency to do a more thorough EIS which fully explores the environmental impacts of each of the Alternatives under consideration.

### 2. Ripeness

 To prove ripeness, Plaintiffs must show that: (1) delayed review would cause hardship to them; (2) the agency action is final; and (3) the Court would not benefit from further factual development of the issues presented. *Ohio Forestry Ass'n Inc. v. Sierra Club,* 523 U.S. 726, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998).

 The second prong of the test is undisputed: the EIS, the decision to adopt Alternative B, and the delegation of authority to the Council are all final decisions. Additionally, it is clear that Plaintiffs would continue to suffer hardship from delayed review if NPS' decision was found to be an unlawful delegation to the Council.

Defendants argue that Plaintiffs' current claims are merely abstract legal claims, and that further factual development will

aid in determining whether NPS has sufficient oversight over the Council to defeat an unlawful delegation claim. Defendants argue that, at a minimum, the Council should be allowed to implement the GMP before the Court considers the issue.

One wonders how long Defendants would have the Court wait—until the River is hopelessly compromised? Allowing the Council to implement the GMP will not change NPS' final delegation decision, and will thus not shed additional light on the legal issue presented by the Plaintiffs. The unlawful delegation claim is ripe and concrete: all agreements relating to the Council's duties have been implemented, and the Court need look no further in deciding whether these duties comprise an unlawful delegation.

 Plaintiffs' NEPA claim is also ripe, since a claim for failure to comply with NEPA becomes ripe as soon as that failure occurs. *Ohio Forestry Ass'n,* 118 S.Ct. at 1672.

Plaintiffs thus have standing to bring both claims, and both claims are sufficiently ripe for review.

### B. Unlawful Delegation

Plaintiffs argue that NPS' decision to adopt Alternative B for management of the Niobrara was an unlawful delegation of its responsibilities and authority. The Court must first examine the extent of NPS' existing statutory obligations before reaching the delegation issue.

#### 1. NPS' Statutory Obligations

Congress created the National Park Service in 1919, and gave it the mission "to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." National Park Service Organic Act, 16 U.S.C. § 1 (1999). As Congress noted, the areas included within the protection of the National Park Service "derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States". 16 U.S.C. § 1a–1 (1999).

In 1968, Congress passed the Wild and Scenic Rivers Act to "preserve [the] selected rivers or sections thereof in their free-flowing condition to protect the water quality of such rivers and to fulfill other vital national conservation purposes". 16 U.S.C. § 1271 (1999). In 16 U.S.C. § 1274, Congress enumerated the rivers that would compose the Wild and Scenic Rivers system, and further indicated which agencies would manage those rivers. The Niobrara Amendment to this statute reads:

(A) The 40–mile segment from Borman Bridge southeast of Valentine downstream to its confluence with Chimney Creek and the 30–mile segment from the river's confluence with Rock Creek downstream to the State Highway 137 bridge, both segments to be classified as scenic and *administered by the Secretary of the Interior.* That portion of the 40–mile segment designated by this subparagraph located within the Fort Niobrara National Wildlife Refuge *shall continue to be managed by the Secretary* through the Director of the United States Fish and Wildlife Service.

(B) The 25–mile segment from the western boundary of Knox County to its confluence with the Missouri River, including that segment of the Verdigre Creek from the north municipal boundary of Verdigre, Nebraska, to its confluence with the Niobrara, to be *administered by the Secretary of the Interior* as a recreational river. After consultation with State and local governments and the interested public, the Secretary shall take such action as is required under subsection (b) of this section.

16 U.S.C. § 1274(a)(117) (1999) (emphasis added). The duties of the Secretary of the Interior are further explained in 16 U.S.C. § 1281(c) (1999) (emphasis added):

> The Secretary of the Interior, in his *administration* of any component of the national wild and scenic rivers system, may utilize such general statutory authorities relating to areas of the national park system and such general statutory authorities otherwise available to him for *recreation and preservation purposes and for the conservation and management of natural resources* as he deems appropriate to carry out the purposes of this chapter.

These statutes give the Secretary of the Interior sole responsibility for administering the lands included in the National Parks system and the National Wild and Scenic Rivers system. Basic rules of statutory construction provide that "absent ambiguity or unreasonable result, the literal language of the statute controls". *United States v. Lin*, 101 F.3d 760, 765 (D.C.Cir.1996) (quoting *Eagle–Picher Indus., Inc. v. U.S. EPA*, 759 F.2d 922, 929 n. 11 (D.C.Cir.1985)), *aff'd*, 924 F.2d 1086 (D.C.Cir.1991). The meaning of "administer" is perfectly clear in this context: it means "to manage ... to direct or superintend the execution, use, or conduct of ... to manage or conduct affairs". Webster's Third New International Dictionary at 27 (1993). Thus, the Secretary, who is specifically charged with administering these lands and rivers, cannot wholly delegate his responsibility to a local entity which is not bound by the statutory obligations set forth above.

The creation of the Advisory Commission does not abrogate the Secretary's duties. The extensive legislative history shows that Congress was aware of the unique situation in the Niobrara (i.e., largely privately owned land), and strongly encouraged local participation in the management of the area. In recognition of this situation, Congress created the Advisory Commission to deflect local opposition to national designation and to aid NPS in developing a management plan for the area.[4] But it is clear that in creating the Advisory Commission, Congress did not intend to undermine the Secretary's duties or shift them to any other entity.

### 2. Delegation of Statutory Obligations

In light of NPS' unambiguous statutory obligation to manage the Niobrara, it must be determined whether NPS' choice of Alternative B, allowing the Council to administer and manage the Niobrara, was permissible.

NPS cannot, under the unlawful delegation doctrine, completely shift its responsibility to administer the Niobrara to a private actor, *Perot v. Federal Election Comm'n*, 97 F.3d 553, 559 (D.C.Cir.1996), particularly a private actor whose objectivity may be questioned on grounds of conflict of interest. *Sierra Club v. Sigler*, 695 F.2d 957, 962 (5th Cir.1983). "The relevant inquiry in any delegation challenge is whether Congress intended to permit the delegatee to delegate the authority conferred by Congress." *United States v. Widdowson*, 916 F.2d 587, 592 (10th Cir. 1990) (citing *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974)). There is no indication in the relevant statutes or the legislative history that

---

4. Plaintiffs argue that Congress created the Advisory Commission as the "primary channel" for local input regarding the administration of the Niobrara, and that the creation of a local managing council violates the intent of Congress. Defendants point out that Plaintiffs' contention would render meaningless the statutes authorizing the creation of cooperative agreements. While Defendants are correct that the Advisory Commission was meant to be primarily an advisory body for aiding NPS in the creation of the management plan, the Advisory Commission's recommendation for the creation of a local council can not shield NPS from the finding that by following that recommendation it may have unlawfully delegated its duties to the council.

Congress intended any variation on the doctrine of unlawful delegation.[5]

 Delegations by federal agencies to private parties are, however, valid so long as the federal agency or official retains final reviewing authority. *United Black Fund, Inc. v. Hampton,* 352 F.Supp. 898, 904 (D.D.C.1972) (holding that no unlawful delegation of authority had occurred because chairman of the U.S. Civil Service Commission retained authority to review policies to make sure they met federal requirements); *see also R.H. Johnson & Co. v. SEC,* 198 F.2d 690, 695 (2d Cir. 1952), *cert. denied* 344 U.S. 855, 73 S.Ct. 94, 97 L.Ed. 664 (1952)(holding that SEC did not unconstitutionally delegate powers to National Association of Securities Dealers, because it retained power to approve or disapprove rules, and to review disciplinary actions). The relevant inquiry in this case therefore becomes whether, in delegating its responsibility to the Council to administer the Niobrara, NPS retained sufficient final reviewing authority over Council actions to prevent a violation of the unlawful delegation doctrine.

According to the GMP, the Interlocal Agreement, and the Cooperative Agreement, Alternative B calls for management of the Niobrara by a local council, with NPS merely serving as liaison and providing technical support as needed. A.R. at 1018. The Council is responsible for hiring staff, monitoring the River resources, evaluating access sites and land protection needs, providing educational and information services, providing law enforcement and emergency services, and maintaining roads, bridges, and other river access sites. Interlocal Agreement, at ¶ 5. These are all duties which fall squarely within the Secretary's responsibilities for managing the Niobrara. The Interlocal Agreement is, however, clear that it is the Council which shall manage the River, Interlocal

Agreement, at ¶ 4. Moreover, the Council is encouraged to seek outside sources of funding to avoid having its decisions "dictated" by NPS. Interlocal Agreement, at ¶ 5(b). To further ensure that NPS does not "dictate" the decisions of the Council, NPS has only one voting member on the Council, and all decisions are made by majority vote. In short, it is clear that NPS retains virtually no final authority over the actions—or inaction—of the Council.

In their defense, Defendants argue that the relevant statutes encourage and authorize NPS to cooperate with local governments, and enter into cooperative agreements, in administering the Niobrara:

> The Federal agency charged with the administration of any component of the national wild and scenic rivers system may enter into written cooperative agreements with the Governor of a State, the head of any State agency, or the appropriate official of a political subdivision of a State *for State or local governmental participation in the administration of the component.* The States and their political subdivisions shall be encouraged to cooperate in the planning and administration of components of the system which include or adjoin State- or county-owned lands.

16 U.S.C. § 1281(e) (1999) (emphasis added).

> (1) The Secretary of the Interior, the Secretary of Agriculture, or the head of any other Federal agency, shall *assist, advise, and cooperate with States or their political subdivisions, landowners, private organizations, or individuals to plan, protect, and manage river resources.* Such assistance, advice, and cooperation may be through written agreements or otherwise. This authority applies within or outside a federally administered area and applies to rivers

---

**5.** The doctrine is referred to as the doctrine of unlawful *sub* delegation in the relevant case-law (the original delegation is from Congress to the agency, and the delegation from the agency to a third party is deemed a subdelegation). For purposes of simplicity, however, the doctrine will be referred to herein as the doctrine of unlawful delegation.

which are components of the National Wild and Scenic Rivers System and to other rivers. Any agreement under this subsection may include provisions for limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources.

16 U.S.C. § 1282(b)(1) (1999) (emphasis added).

Although NPS is given the authority to enter into cooperative agreements with local governments, there is nothing in any of the statutes or legislative history cited by either party to suggest that Congress wished to change the traditional role of NPS in managing lands and rivers under its stewardship. Furthermore, there is no precedent for the extent to which NPS has delegated its responsibilities to the Council. This is the first such agreement of its kind in NPS' history.[6]

The relevant statutes and legislative history are clear that NPS retains its statutory obligation to manage and administer the Niobrara. Even though NPS is required to consider the recommendations of the Advisory Commission, and NPS may enter into cooperative agreements with local entities in carrying out its obligations, the fact remains that the administration of such areas is still the responsibility of NPS. Nothing in the statutes or legislative history gives NPS the discretion to completely abdicate its responsibilities to a local entity.

The Court concludes that Defendants' delegation of its statutory management duties to the Council violates the unlawful delegation doctrine because NPS retains no oversight over the Council, no final reviewing authority over the council's actions or inaction, and the Council's dominant private local interests are likely to

conflict with the national environmental interests that NPS is statutorily mandated to represent. NPS lacks the authority to: appoint or remove members of the Council, aside from its own representative; determine which interests will be represented; select Council officers; establish Council sub-committees; determine the term limit for Council members; veto Council decisions which are contrary to the GMP; independently review Council decisions prior to implementation; and control Council funding. The delegation is also unlawful because the Council, made up almost wholly of local commercial and land-owning interests, does not share NPS' national vision and perspective. NPS controls only one of the 15 Council members, and is the only member, besides FWS, who represents national environmental concerns.

The only power NPS retains is the extreme remedy of totally terminating the Cooperative Agreement if the Council is not managing the Niobrara consistent with the GMP. Use of such a draconian weapon is highly unlikely, especially since NPS claims that without local participation, it could not effectively meet its goals and objectives because of local opposition to federal management. Defs.' Opp'n at 1.

Defendants argue at length that they have supervisory power over the Council, that they are not bound by Council decisions, that they retain ultimate accountability and authority over management of the Niobrara, that they can review the Council's actions for consistency with the GMP, and that they can evaluate the Council's progress. Defendants offer no specifics to support their argument, and in fact, the exact nature and scope of the relationship between the Council and NPS remains vague and unclear.

---

6. The precursor to the Niobrara Council concept is the Upper Delaware Council. Under that plan, the Council can make recommendations to the Secretary of the Interior, but the Secretary has full authority to accept or reject those recommendations based on their consistency with the management plan for that river. Pls.' Ex. 13, Upper Delaware River Management Plan, at iv. The Niobrara Council is the first council, however, which has been granted powers which are so broad and unreviewable.

Defendants claim they have ultimate accountability and authority "for protection and management of the Niobrara" through the GMP/EIS, the ROD, and the Cooperative Agreement, but they provide no explanation of how they can exercise this authority, aside from terminating the Cooperative Agreement. Defendants argue that the Council is guided in its work by the GMP/EIS, but do not explain how the NPS will supervise the Council's work to achieve compliance with these documents.

Defendants argue that the Council's actions are "subject to NPS review at all times", yet offer no specifics as to what this "review" consists of, and whether it would actually prevent the Council from taking any action if NPS disapproved. Defendants say that the NPS "intends" the Cooperative Agreement to require the Council to carry out its activities to "standards acceptable to the National Park Service", yet can cite to no provision in the Interlocal Agreement or the Cooperative Agreement manifesting such NPS "intention". Defendants claim that NPS "retains authority to 'consider for consistency with the GMP the advice and recommendations of the Council during and upon completion of its activities identified above'", yet do not say whether this "retained" authority allows them to prevent the Council from undertaking any activity inconsistent with the GMP. Defendants do not even indicate what actions by the Council would move NPS to terminate the Cooperative Agreement.

The tenuous relationship between the Council and NPS raises additional questions as to how exactly NPS intends to ensure compliance with all applicable federal laws (such as the APA; NEPA; the Freedom of Information Act, 5 U.S.C. § 552; Land and Water Conservation Fund Act, 16 U.S.C. § 460*l*–4, *et seq.;* National Historical Preservation Act, 16 U.S.C. § 470, *et seq.,* etc.), considering that the Council is not a federal entity and thus not obligated to comply with these laws.

Although NPS claims that it will ensure that all federal statutes are complied with, Defendants have offered no specifics, and presented no evidence, to support their argument that they would be able to ensure compliance, especially given that compliance would require extensive and *voluntary* participation by the Council.

In the end, Defendants' only authority over the Council appears to be its ability to terminate the Cooperative Agreement, a draconian remedy that NPS would be unlikely to exercise except in an extreme situation. This does not constitute the "final reviewing authority" required to prevent an unlawful delegation. Since it is clear that NPS has no "final reviewing authority" over the Council, the selection of Alternative B violates the unlawful delegation doctrine, constitutes an abuse of discretion, is not in accordance with the law, and is in excess of the Secretary's and NPS' statutory jurisdiction.

## C. NEPA Compliance

In its Environmental Impact Statement ("EIS"), NPS considered Alternatives B, C, and D together, without evaluating possible environmental impacts that might occur under each of the Alternatives. Plaintiffs allege that Defendants' EIS is so insufficient that it violates the principles and mandates of NEPA. Defendants offer two responses: first, the EIS is sufficient under the "tiering approach", and second, because all management plans have the same "desired future conditions", the analysis is the same for all alternatives and no further evaluation need be undertaken.

NEPA requires a federal agency to prepare an EIS whenever it is engaged in a major federal action that would significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Specifically, NEPA requires agencies to:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human envi-

ronment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) *alternatives to the proposed action,*

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. *Id.* [emphasis added].

■ The statute is clear that the agency must examine and consider alternatives to proposed actions. NEPA does not merely require the listing of alternative courses of action, but also "a presentation of the environmental risks incident to reasonable alternative courses of action." *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 834 (D.C.Cir. 1972). The reason for this is obvious. When an agency is considering several courses of action, the "desired future conditions" will always be the same: accomplishment of the agency's long-term goal, whether it be building a highway or transporting hazardous waste. However, not all alternatives are created equal, and some will be more environmentally-friendly than others. For example, building a highway through the habitat of an endangered species will have the same "desired future condition" as building that highway so as to avoid disturbing that habitat, yet the environmental impact will be drastically different depending on which alternative is chosen.

Furthermore, without the detailed information generated by a comprehensive EIS, the agency will have no way to choose among the different alternatives.

"What is required is information sufficient to permit a reasoned choice of alternatives so far as environmental aspects are concerned." *Id.* at 836.

Several regulations govern the creation of a sufficient and detailed EIS. The first is 40 C.F.R. § 1502.2:

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

. . .

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

Under 40 C.F.R. § 1502.14 (emphasis added) an agency preparing an EIS is directed to:

. . . present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) *Rigorously explore and objectively evaluate all reasonable alternatives,* and for alternatives which were eliminated from detailed study, *briefly discuss the reasons for their having been eliminated.*

(b) *Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.*

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

Finally, 40 C.F.R. § 1502.16 governs the "environmental consequences" section of an EIS (emphasis added):

... This section ... shall include discussions of:

(a) Direct effects and their significance.

(b) Indirect effects and their significance.

(c) *Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned.*

(d) *The environmental effects of alternatives including the proposed action* ...

■■■ In this case, Defendants' EIS failed to sufficiently detail significant foreseeable adverse environmental impacts that would result from each Alternative management option. Instead, Defendants treated Alternatives B, C, and D as one option, and did only one analysis for all three Alternatives. Defendants offer two explanations for why they did not do more thorough analysis of Alternatives B, C, and D. Their first explanation is that this EIS is a "plan-level" EIS, and does not require the same degree of detail as a "site-specific" EIS. Defendants argue that because they were analyzing a "general management plan", and not any specific action, a more detailed EIS was not necessary. Defendants claim that their EIS follows the "tiered" approach of 40 C.F.R. § 1502.14:

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.

Even assuming the "tiering approach" is applicable to this situation, it is clear that Defendants' EIS is deficient. Defendants do not explain why, despite the fact that Alternative B was the preferred alternative at the time the EIS was written, and the alternative ultimately chosen, a detailed analysis was not done of at least that alternative. If indeed the EIS is a "plan-level" EIS subject to the tiering approach, Defendants must at the very least perform a sufficient analysis of the different Alternatives to justify choosing one over the others.

The single case on which Defendants rely is clearly distinguishable and does not support Defendants' argument. In *New-*

ton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 806 (8th Cir.1998), the United States Forest Service *first* conducted a full EIS, analyzing the environmental impact of its ten-year forest management plan. The EIS included an analysis of possible future timber sales. *Id.* Using the tiering approach, the Forest Service then conducted smaller Environmental Assessments ("EA"), rather than a full EIS, on four proposed timber sales. *Id.* at 807. The plaintiffs in *Newton County* did not challenge the Forest Service's EIS, but rather challenged the smaller EA's, alleging they were inadequate. *Id.* at 809. In this case, plaintiffs allege that NPS' initial EIS is inadequate, and that, unlike *Newton County,* Defendants have not sufficiently analyzed the environmental consequences of the chosen alternative. Thus, contrary to Defendants' attempts to do so, they cannot justify an insufficient initial EIS by alleging that they were following the tiering approach.

Defendants' second explanation for not having done a more thorough analysis of the different alternatives is that they did not need to because the "desired future conditions" are the same under all three alternatives, and therefore there is no basis for believing that one plan will result in different or greater environmental impact. Defendants further argue that they can control the environmental impact caused by Alternative B, because they can terminate the Cooperative Agreement at any time and switch to one of the other alternative plans. Defendants cite to no case or statute that supports their argument.

More significantly, this rationale is completely at odds with NEPA's purpose, which is to force agencies to consider all environmental consequences of choosing one course of action over another *before* making a final decision. The "desired future conditions" of alternative actions will *always* be the same as those of the proposed action, otherwise there would be no reason for considering a particular alternative. The inconsistency of Defendants' ar-

gument with the principles of NEPA is demonstrated by the fact that Defendants' EIS is completely lacking in any discussion of what the environmental impact would be if the Council management plan fails. While such a failure would necessitate the termination of the Cooperative Agreement and the adoption of one of the other Alternatives, the lost time and the Council's failure would surely have a great impact on the environment.

Thus, neither of Defendants' explanations for its abbreviated EIS survives close scrutiny. Defendants' EIS is therefore insufficient, and violates the mandates and principles underlying the National Environmental Policy Act.

## IV. Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment [# 18] is **granted,** and Defendants' Motion for Summary Judgment [# 19] is **denied.** Defendants are further enjoined from unlawfully delegating their responsibilities to manage the Niobrara, and are ordered to fulfill their statutory obligations to manage the River. Finally, Defendants are ordered to perform a new and thorough EIS, in compliance with the requirements of NEPA. An Order will issue with this Opinion.

### ORDER

Plaintiffs bring this suit against Robert Stanton, Director of the National Park Service, and Bruce Babbitt, Secretary of the Department of the Interior, challenging Defendants' plan for management of the Niobrara National Scenic River, located in Nebraska. The challenged management plan, under which NPS delegates all its responsibilities for managing the Niobrara to an independent local council over which NPS has virtually no control, is the first of its kind. Plaintiffs also challenge the adequacy of the Environmental Impact Statement created by Defendants pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"). This matter is before the Court on the parties'

cross-motions for summary judgment. Upon consideration of the motions, oppositions, replies, and the entire record herein, for the reasons discussed in the accompanying Memorandum Opinion, it is hereby

**ORDERED,** that Plaintiff's Motion for Summary Judgment [# 18] is **granted,** and Defendants' Motion for Summary Judgment [# 19] is **denied;** it is further

**ORDERED,** that Defendants are permanently enjoined from implementing the Final General Management Plan and Record of Decision for the National Niobrara Scenic River; it is further

**ORDERED,** that this case is remanded to the United States Department of the Interior for such further proceedings as necessary to prepare a General Management Plan/Environmental Impact Statement that complies with NEPA.